# 13-0561-cv

## United States Court of Appeals
### for the
## Second Circuit

ELIJAH TURLEY,

*Plaintiff-Appellee,*

– v. –

ISG LACKAWANNA, INC., ISG LACKAWANNA, LLC, MITTAL STEEL USA
LACKAWANNA INC., LARRY D. SAMPSELL, GERALD C. MARCHAND,
THOMAS JAWORSKI, MITTAL STEEL USA, INC., dba ARCELOR-MITTAL
USA, INC., MITTAL STEEL USA INC., aka ARCELORMITTAL STEEL,
ARCELOR MITTAL LACKAWANNA, LLC, fka ISG LACKAWANNA, LLC,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## FINAL FORM BRIEF FOR PLAINTIFF-APPELLEE
## ELIJAH TURLEY

SCHNITTER CICCARELLI MILLS PLLC
8770 Transit Road, Suite 3
East Amherst, New York 14051
(716) 639-7690

– and –

HARRIS BEACH PLLC
726 Exchange Street, Suite 1000
Buffalo, New York 14210
(716) 200-5050

*Attorneys for Plaintiff-Appellee*
*Elijah Turley*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    Daily Environment of Racial Harassment. . . . . . . . . . . . . . . . . . . . . 3
    B.    Specific Incidents of Escalating Hostile Events
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        "Dancing Gorilla". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        "King Kong Lives" and "KK" Graffiti. . . . . . . . . . . . . . . . . . . . . 7
        Pelc's Death Threat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        "No Lazy People". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Jaworski Continues His Harassment of Turley. . . . . . . . . . . . . . . 11
        Turley's Workstation Chair Is Destroyed . . . . . . . . . . . . . . . . . . . 11
        Pelc Again Threatens to Kill Turley. . . . . . . . . . . . . . . . . . . . . . . 12
        Turley is Forced to Work and Communicate with Pelc. . . . . . . . . 12
        KKK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        Defendants Fail to Respond to Turley's Alertline Complaints. . . . . 14
        Sampsell Attempts to Get Turley Fired . . . . . . . . . . . . . . . . . . . . . 14
        Turley's Vehicles Are Repeatedly Vandalized. . . . . . . . . . . . . . . . 16
        Daley Confronts Turley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        Cry Baby Graffiti . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        Additional Death Threats. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        The Second KKK Incident. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        Another Co-Worker Confronts Turley. . . . . . . . . . . . . . . . . . . . . . 20
        The Black Monkey Hung by a Noose.. . . . . . . . . . . . . . . . . . . . . . 20
        Pelc Destroys a Chair to Prevent Turley from Using It. . . . . . . . . . 22
        Monkey Sounds Are Broadcast Throughout the Pickler. . . . . . . . . 22
        Death Threats Against Turley and His Attorney . . . . . . . . . . . . . . . 23
        Menacing Graffiti About Turley and His Family. . . . . . . . . . . . . . 25
        Racist Graffiti on a Railroad Car in the Pickler. . . . . . . . . . . . . . . 25

    C.    Defendants' Alarmingly Inadequate Response. . . . . . . . . . . . . . . . 26

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

STANDARDS OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    POINT I     THE JUDGMENT FOR INTENTIONAL INFLICTION
                OF EMOTIONAL DISTRESS SHOULD BE AFFIRMED. . 37

        A.     The Judgment Against Lackawanna Should Be Affirmed. . . 39

        B.     The Judgment Against Sampsell Should Be Affirmed. . . . . 42

    POINT II    THE JUDGMENT OF SINGLE EMPLOYER
                SHOULD  BE AFFIRMED. . . . . . . . . . . . . . . . . . . . . . . . . . 44

        A.     AMUSA and Lackawanna Are a Single Employer. . . . . . . . 44

            1.     Centralized Control of Labor Relations. . . . . . . . . . . 46

            2.     Interrelation of Operations, Common Management,
                    and Common Ownership . . . . . . . . . . . . . . . . . . . . . . . 52

        B.     AMUSA Is Liable for the NYHRL Claim. . . . . . . . . . . . . . 55

    POINT III   THERE WAS NO FUNDAMENTAL ERROR
                IN THE JURY CHARGE AND VERDICT FORM. . . . . . . 56

        A.     Defendants Failed to Preserve their Objections. . . . . . . . . . 56

        B.     The Jury Charge  and Verdict Form Were Proper . . . . . . . . 57

        C.     Defendants Cannot Show Prejudice. . . . . . . . . . . . . . . . . . . 59

    POINT IV   GIVEN TURLEY'S EGREGIOUS EMOTIONAL DISTRESS
                THE COMPENSATORY DAMAGES AWARD
                DOES NOT SHOCK THE CONSCIENCE. . . . . . . . . . . . . . 61

A. Turley Suffered and Continues to Suffer Egregious Emotional Distress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

B. Damages for Emotional Distress Do Not Require Discriminatory Firing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

C. Given Turley's Immense and Continuing Suffering, the Jury's Compensatory Damages Award Does Not Shock the Conscience. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

V. THE PUNITIVE DAMAGES ARE NOT GROSSLY EXCESSIVE AND DO NOT SHOCK THE CONSCIENCE. . . . . . . . . . . . . . . . . 72

A. The Punitive Damages Award Should Be Affirmed. . . . . . . . 72

1. The Defendants's Conduct Was Extremely Reprehensible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

2. The Remitted Ratio of 3.8:1 Is Not Grossly Excessive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

3. Sanctions for Comparable Misconduct. . . . . . . . . . . . 81

4. The Punitive Award Will Not Have "Stratospheric" Effects. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

B. The Punitive Award Against Lackawanna Should Be Affirmed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

# TABLE OF AUTHORITIES

**Cases**

*Abel v. Town Sports Intern., LLC*, 2012 WL 6720919 (S.D.N.Y. 2012) . . . . . . . 66

*Almeida v. Athena Health Care Assoc., Inc.*, 2009 WL 490066
 (D. Conn. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). . . . . . . . . 72, 73, 77, 81

*Bogle v. Mclure*, 332 F.3d 1347 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Bonner v. Guccione*, 916 F. Supp. 271 (S.D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . 38

*Brink's Inc. v. City of New York*, 546 F. Supp. 403(S.D.N.Y. 1982),
 *aff'd,* 717 F.2d 700 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Carroll v. Bayeriche Landesbank*, 125 F. Supp.2d 58 (S.D.N.Y. 2000). . . . . . . . 40

*Cavallaro v. Pozzi*, 28 A.D.3d 1075 (4th Dept. 2006). . . . . . . . . . . . . . . . . . . . . . 38

*Chopra v. Gen. Elec. Co.*, 527 F. Supp. 2d 230 (D. Conn. 2007). . . . . . . 69, 78, 81

*Collins v. Willcox Inc.*, 158 Misc.2d 54 (Sup. N.Y. Co. 1992). . . . . . . . . . . . . . . 38

*Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235 (2d Cir. 1995). . . . . . . . . 44, 46

*Cooper v. Braun Horticulture, Inc.*, 2002 WL 1063922 (W.D.N.Y. 2002). . . . . . 45

*DeNardi v. DRA Imaging, P.C.*, 605 F. Supp.2d 550 (S.D.N.Y. 2009). . . . . . . . . 45

*Elson v. Consolidated Edison Co. of New York, Inc.*, 226 A.D.2d 288
 (1st Dept. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005). . . . . . . . . . . . . . . . . 79

iv

*Gray v. Schenectady City School District*, 86 A.D.3d 771 (3d Dept. 2011). . . . . 38

*Greenbaum v. Handelsbanken*, 67 F.Supp.2d 228 (S.D.N.Y. 1999) . . . . . 77, 78, 79

*Haraburda v. Arcelor Mittal USA, Inc.*, 2011 WL 2600756 (N.D. Ind. 2011). . . 76

*Hargett v. Metro. Transit Auth.*, 552 F. Supp.2d 393 (S.D.N.Y. 2008). . . . . . . . . 55

*Hawkins v. Legal Service Care*, 163 F.3d 684 (2d Cir. 1998). . . . . . . . . . . . . . . 81

*Hill v. Airborne Freight Corp.,* 212 F. Supp.2d 59 (E.D.N.Y. 2002),
  *aff'd,* 93 F. App'x 260 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Howell v. New York Post Co.*, 81 N.Y.2d 115 (1993). . . . . . . . . . . . . . . . . . . . . . 37

*Hughes v. Patrolmen's Benev. Ass'n of City of New York, Inc.*,
  850 F.2d 876 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Kaminski v. United Parcel Service*, 120 A.D.2d 409 (1st Dept. 1986). . . . . . . . . 39

*Kauffman v. Maxim Healthcare Services, Inc.,* 509 F.Supp.2d 210
  (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*LaBozzo v. Brooks Bros., Inc.*, 2002 WL 1275155 (Sup. N.Y. Co. 2002). . . . 39, 40

*Levine v. Reader's Digest Ass'n, Inc.*, 2007 WL 4241925 (S.D.N.Y. 2007). . . . 47,
  52

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012). . . . . . . . . . . . . . . 36, 58, 66

*Magill v. Precision Systems Mfg., Inc.*, 2006 WL 468212 (N.D.N.Y. 2006). . . . . 49

*McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*,
  175 Misc. 2d 795 (Sup. Ct. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 78

*Meisel v. Grunberg*, 2013 WL 1197498 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . 56

*Niland v. Buffalo Laborers Welfare Fund*, 2007 WL 3047099
  (W.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*O'Rourke v. City of Providence*, 235 F.3d 713 (1st Cir. 2001).. . . . . . . . . . . . . 58

*Osorio v. Source Enterprises, Inc.*, 2007 WL 683985 (S.D.N.Y. 2007). . . . . . . 68

*Pacific Mut. Life Ins. v. Haslip,* 499 U.S. 1 (1991).. . . . . . . . . . . . . . . . . . . . 77, 78

*Palmer v. Hoffman*, 318 U.S. 109 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Passantino v. Johnson & Johnson Consumer Products, Inc.*,
  212 F.3d 493 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Payne v. Jones*, 711 F.3d 85, 98 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . 36, 73

*Peltier v. Apple Health Care., Inc.*, 130 F. Supp.2d 285 (D. Conn. 2000).. . . . . . 45

*Perry v. Ethan Allen, Inc.*, 115 F.3d 143 (2d Cir. 1997).. . . . . . . . . . . . . 35, 58, 59

*Phillips v. Bowen,* 278 F.3d 103 (2d Cir.2002). . . . . . . . . . . . . . . . . . . . . . . 35, 68

*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001). . . . . . . . . . . . 81

*Pollard v. E.I. Dupont De Nemours, Inc.*, 412 F.3d 657 (6th Cir. 2005). . . . . . . 69

*Polley v. Federal Reserve Bank of New York*, 1994 WL 465923
  (S.D.N.Y. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38
  (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Regan v. In the Heat of the Night, Inc.*, 1995 WL 413249 (S.D.N.Y. 1995). . . . . 45

*Riviello v. Waldron*, 47 N.Y.2d 297 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Saleh v. Pretty Girl, Inc.*, 2012 WL 4511372 (E.D.N.Y. 2012) . . . . . . . . . . . 48, 55

*Sawicka v. Catena*, 79 A.D.3d 848 (2d Dept. 2010)............................. 43

*Scala v. Moore McCormack Lines*, 985 F.2d 680 (2d Cir. 1993)............ 37, 66

*SEC v. DiBella*, 587 F.3d 553 (2d Cir. 2009)................................. 35

*Shannon v. MTA Metro-North Railroad*, 269 A.D.2d 218 (1st Dept. 2000)..... 38

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)...... 73, 77, 78

*Stuto v. Fleishman*, 164 F.3d 820 (2d Cir. 1999)............................. 38

*Sullivan v. Board of Education*, 131 A.D.2d 836 (2d Dept. 1987)........... 38, 39

*Swinton v. Potomac*, 270 F.3d 794 (9th Cir. 2001)............................ 79

*Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995)........................... 81

*Toriola v. New York City Transit Authority*, 2005 WL 550973
  (S.D.N.Y. 2005)............................................................. 49

*Town of Hempstead v. State Div. of Human Rights*, 233 A.D.2d 451
  (2d Dept. 1996).............................................................. 69

*TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443 (1993)...... 78

*U.S. v. Bethlehem Steel Corp.*, 1972 WL 207 (W.D.N.Y. 1972)................. 75

*U.S. v. Bethlehem Steel Corp.*, 446 F.2d 652 (2d Cir. 1971)................. 75

*Vasarhelyi v. New School for Social Research*, 230 A.D.2d 658
  (1st Dept. 1996)......................................................... 39, 43

*Vasbinder v. Scott*, 976 F.2d 118 (2d Cir. 1992)............................. 73

*Watson v. E.S. Sutton, Inc.*, 2005 WL 2170659 (S.D.N.Y. 2005)............... 80

*Watson v. E.S. Sutton, Inc.*, 225 F. App'x 3 (2d Cir. 2006). . . . . . . . . . . . . . . . . . 80

*Westphal v. Catch Ball Products Corp.*, 953 F. Supp. 475 (S.D.N.Y. 1997) . . . . 45

*Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8th Cir. 2004) . . . . . . . . . . . . . 78

*Williams v. Quebecor World Infiniti Graphics*, 456 F. Supp.2d 372
 (D. Conn. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Williamson v. Bethlehem Steel Corp.*, 488 F. Supp. 827 (W.D.N.Y. 1980). . . . . . 75

*Wulach v. Bear, Stearns & Co.*, 1988 WL 123632 (S.D.N.Y. 1988). . . . . . . . 39, 40

*Zajac v. Mittal Steel USA*, 2008 WL 4936975 (N.D. Ind. 2008). . . . . . . . . . . . . 75

*Zeno v. Pine Plains Cent. School Dist.*, 702 F.3d 655 (2d Cir. 2012). . . . 36, 70, 71

*Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003). . . . . . . . . 79

## Statutes and Regulations

29 C.F.R. §1604.11(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

42 U.S.C. §1981. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 72, 81

42 U.S.C. §1981a.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

42 U.S.C. §2000e *et. seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 72, 75, 81

N.Y.C.P.L.R. §5501(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

N. Y. Exec. Law §290 *et. seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56, 59

## Other Authorities

Restatement (Third) of Torts §46 (comment d)(2012). . . . . . . . . . . . . . . . . . . . . . 39

# STATEMENT OF ISSUES

1. Where the evidence shows extreme and outrageous harassment over a prolonged period, and defendants condoned and fostered that harassment, was it sheer surmise and conjecture for the jury to find intentional infliction of emotional distress (IIED)?

2. Where the evidence shows centralized control of labor relations, including with respect to the claim at issue, interrelation of operations and common management and ownership, was it sheer surmise and conjecture for the jury to find a single employer?

3. Where the District Court charged the jury to consider the totality of the employer's response in determining whether its actions were reasonable, was it fundamental error to charge an employer is liable if a supervisor or successively higher authority knew of the hostile environment and failed to take remedial action?

4. Where the jury found plaintiff suffered egregious emotional distress due to extreme racial harassment occurring every day for over three years, and the effects on plaintiff are permanent and debilitating, does a compensatory damages award of $1,320,000 shock the conscience?

5. Where defendants repeatedly engaged in extremely reprehensible

conduct over three and one-half years, acting in reckless disregard for plaintiff's health and safety, is a punitive damages ratio of 3.8:1 grossly excessive or does it shock the conscience?

## STATEMENT OF FACTS

Elijah Turley (Turley) is an African American man who worked as a steelworker at a steel plant in Lackawanna, New York from 1995 until the plant closed in March 2009. The jury found ArcelorMittal Lackawanna, LLC (Lackawanna) and its parent corporation, ArcelorMittal USA Inc. (AMUSA), constituted a single employer for purposes of Turley's hostile work environment claims.[1]

In 1997, Turley joined the Lackawanna plant's Pickler Department where large steel coils were processed through an acid tank. He initially enjoyed his job in the Pickler. (A277) Its environment changed, however, when defendant Thomas Jaworski (Jaworski) became Area Manager in 2003. (A484)

_____

[1] The Lackawanna plant was originally owned by Bethlehem Steel. It was purchased by ISG Lackawanna Inc., a wholly-owned subsidiary of International Steel Group Inc., in May 2003. In January 2004, ISG Lackawanna Inc. became ISG Lackawanna LLC. In April 2005, Mittal Steel Co. purchased the parent corporation, and changed the name to Mittal Steel USA Inc. In June 2006, Mittal Steel Co. and Arcelor merged, creating ArcelorMittal Inc. Mittal Steel USA Inc. changed its name to ArcelorMittal USA Inc. Its wholly owned subsidiary, ISG Lackawanna LLC, then changed its name to ArcelorMittal Lackawanna LLC. (SPA5)

Jaworski treated Turley differently than white workers, allowing them to work overtime, although Turley had more seniority.  (A280)  Turley tolerated it for some time, but in September 2005, he filed grievances challenging Jaworski's discriminatory conduct.  (A278-80)  Defendant Larry Sampsell (Sampsell), who was Labor Relations and Security Manager, never resolved the grievances. (A169-70)  Plant superintendent Chris Richards, the highest local manager, told Turley "that's the way it is, you don't like it, too bad."  (A281)

## A.    Daily Environment of Racial Harassment

After the grievances were filed, Area Manager Jaworski initiated a campaign of harassment against Turley, constantly calling him "boy," telling him to "shut up.  I can do whatever I want, boy."   Jaworski degraded Turley and subjected him to heightened scrutiny to find ways to penalize him.[2]  (A283-84; A285-87)  Jaworski's openly degrading treatment signaled employees they could also harass Turley.  (A398)  For Turley, filing the grievances was like opening the floodgates from hell.  (A282)

The evidence unequivocally demonstrates Turley endured a constant daily

---

[2]  Jaworski had a history of retaliating.  When another African American employee complained about Jaworski's discrimination, Jaworski and Sampsell forced him to transfer out of the Pickler with a pay reduction.  (A438-39, A445)

environment of racial abuse.[3]  Workers described an environment that was "just complete racism" and "right in your face."  (TT5:15, 22)  A defense witness testified the harassment continued to escalate until the plant closed in 2009.  (A629-32)  Another witness observed the harassment of Turley was continuous and never stopped.  (A25)  Another explained the already dangerous steel plant environment was made far worse by the Pickler's racial tension, and he was afraid Turley would get hurt.  (A251, A264)  The union representative testified:

> [Turley] was losing it....[I]t was building up.  It was bothering me, and I was only the grievance committeeman.  I dread his phone calls calling me.  I always knew it was going to be something major going on over there.  So healthwise he was a nervous wreck.  He was shot.  He was scared to come to work.

(A186)  Turley confirmed he was frightened, cried every day, and felt threatened because if something happened to him, defendants would cover it up.  (A309)

For years, white workers regularly called Turley nigger.  (A242; A335; A630)  One witness testified 30 to 50 percent of Pickler employees called Turley nigger, frequently calling him "that fucking nigger."  (A224-25)  Another heard the plant superintendent refer to Turley, stating we're not going to let this dumb nigger tell us what to do.  (A243)

---

[3]  Jaworski confirmed Turley was the only regularly scheduled African American on his shift in the Pickler.  (A485-86)

Co-workers dehumanized Turley, frequently calling him monkey, baboon, ape or gorilla. Turley reported this to Sampsell, Human Resources Manager Gerald Marchand (Marchand), and successive plant superintendents, but they dismissed it as horseplay. (A 263; A269; A292-93; A299; A335)

Workers used the Pickler's communication system to broadcast racial slurs, threats and monkey sounds. It could be heard in the shift manager's office, but the racist broadcasts did not stop. (A347-51)

White workers segregated Turley, refusing to talk to him or eat lunch with him. They would not look at him, acting like he did not exist in their world. (A287) A co-worker described management's attitude: Turley was unwanted because of his race. (A224)

The Pickler was a continuous operation, but Senior Operating Technicians James Reiter and Kevin Daley refused to relieve Turley for bathroom breaks, telling him "to shit on [him]self." (A373-74; A418-19) While defendants tell this Court Marchand and Jaworski investigated (Appellants' Brief, at 10), Marchand merely asked Jaworski to talk to Reiter, and Jaworski confirmed Reiter refused to relieve Turley. Rather than discipline the offenders, defendants placed a portable toilet by Turley's workstation, rewarding the harassment by forcing Turley to use a different, inferior bathroom facility. (A328; A733-34; A739) The union man

attempted to raise a grievance, but Sampsell directed him not to. (A180-81)

Every day, black grease was smeared over the door and control handles of Turley's workstation. Co-worker Frank Pelc stated "it must have been that boon that's doing it." (A262-63) When the opposite shift worker complained about the ongoing harassment of Turley, the shift manager threatened to discipline him. (A258-62; A320-21) Turley showed Jaworski, but he refused to do anything. No supervisor responded, and the daily greasing continued. (A259-60; A323)

Turley's name was repeatedly scratched off time sheets after he signed that he worked his shift. Shift managers were charged with verifying timesheet accuracy, but never corrected the scratch-offs, which reduced Turley's pay. Marchand confirmed Turley's name was scratched off many times. He "investigated" on one occasion by publicly asking workers on the Pickler floor two questions: (1) "Anybody F'ing around with E[lijah]?" and (2) "Know who scratched out his name on time sheets?" (A843-44; A1166) Rather than changing the timesheet system or ordering managers to correct the timesheets, the onus was placed on Turley to contact the timekeeper each week to ensure his time was entered accurately and he was fully paid. (A374-75; A414-17; A449-50)

This daily harassment continued uncontrolled from 2005 until the plant closed in 2009.

**B.     Specific Incidents of Escalating Hostile Events**

Amidst the daily environment of overt racism, specific extreme acts of harassment occurred.

*"Dancing Gorilla"*

In December 2005, a "Dancing Gorilla" sign was hung on Turley's workstation.  By now, co-worker Frank Pelc openly referred to Turley as an animal – monkey, baboon, ape and gorilla.  (A290-92)  The shift manager disposed of the sign, destroying the evidence.  No one investigated.  At trial, HR Manager Marchand continued to deny a Dancing Gorilla sign on an African American's workstation is racially offensive.  (A528-29)

*"King Kong Lives" and "KK" Graffiti*

In January 2006, "King Kong Lives" was painted on the metal floor plate Turley crossed to enter his workstation and on a steel coil next to it, and "KK" was painted on the workstation wall.  (A1333; A1335; A1336).  Supervisors Jaworski and Sampsell laughed, telling Turley to take his family to the movie.  (A295-305)  Witnesses agreed the graffiti remained for weeks.  (A226; A231; A252; A426)  Turley repeatedly asked management to remove it, to which Jaworski responded "get a can of paint and paint it yourself."  (A297)  Rather than removing it, defendants made a feeble effort to spray-paint over the KK and King Kong Lives

on the floor plate, which highlighted the graffiti's former presence. (A1334; A1337)  The coil graffiti was never removed before it was eventually used in the production process.  (A229-31; A492)

Defendants' response gave a green light to further racial harassment. Supervisors Marchand, Jaworski and Sampsell held a 15 minute meeting for each of the Pickler's two shifts.[4]  Marchand and Sampsell were upset about the presence of graffiti rather than its racist nature. (A533-34; A607-08)  Sampsell declared he would not allow outside agencies to investigate incidents in the Pickler.  (A404) Although he claimed the person responsible would be suspended for 30 days or discharged (A174-75; A440; A627), Sampsell stopped co-worker Pelc from publicly announcing he wrote the racist graffiti.  (A401-02; A757)

After the meeting, Sampsell met privately with Pelc, with whom he was friends.  Pelc told Sampsell he painted the racist graffiti and intentionally directed it at Turley.  (A294; A719)  Evidence about the incident mysteriously disappeared from Sampsell's desk and he did nothing to locate or re-gather it.[5]  (A531)

---

[4]  After these two meetings in January 2006, defendants never held another crew meeting to address the racial harassment.

[5]  Much of the demonstrative evidence, including photographs of the racist graffiti, was gathered by Turley, not defendants despite their claimed investigations.  (A344)

The "punishment" originally threatened by Sampsell became a reward. Almost two months later Pelc received three days off without pay, but was compensated with higher paid overtime shifts that same week. Pelc mocked his suspension as a vacation and told another employee he was not disciplined. (A176-77; A253; A306-07; A715-17)

Sampsell and Marchand claimed at trial they thought the King Kong graffiti painted on Turley's workstation was meant for a white employee who worked in a booth thirty feet away. That white employee testified the excuse made no sense, and he did not think Sampsell believed it. (A627-28) The jury rightfully inferred it was a smokescreen to explain defendants' refusal to discipline the harasser.

***Pelc's Death Threat***

A few weeks later in February 2006, Pelc confronted Turley, screaming "Hey, you fucking black bitch. You fucking black piece of shit." (A307) He made monkey sounds whenever Turley tried to speak, and threatened "when I see your black nigger ass on the outside, I'm going to fucking shoot you." (A308) Sampsell and Marchand found Turley sobbing and gasping for breath, and immediately sent him to the hospital where he was diagnosed with panic attacks and PTSD. (A382-84; A537-39; A576) Witnesses told the union representative Pelc "was going nuts on Elijah Turley" (A193) and one worker confirmed the

death threats. (A189-90) Marchand and Sampsell "investigated" by asking the employees in a group if Pelc threatened to kill Turley. (A578) They never talked to the union representative who investigated the incident.

Pelc admitted to Sampsell he told Turley he would "get you on the outside for this." (A579; A801) Despite Pelc's racist graffiti, his admission, and the severe effect on Turley, Sampsell downplayed it as a veiled threat. He gave Pelc two days off and placed him back in the Pickler on the same shift with Turley. Turley reported the threats to the Lackawanna Police Department, but when Police Detective Daniel Cardi attempted to investigate the criminal harassment, Sampsell protected Pelc, assuring Cardi the company would deal with the threats internally. (A457-60)

### *"No Lazy People"*

The following month, "No Lazy People" was written on a wall in plain view of Turley's workstation. (A1338) The graffiti reinforced racist remarks by co-workers Pelc, Daley and Paul Edgar that African Americans are lazy. (A314-18; A725) Turley witnessed an employee write the graffiti and reported it, but Marchand admittedly investigated a "long time afterwards." (A591) The graffiti remained for a lengthy period and the perpetrator was never disciplined. (A318; A1162)

### *Jaworski Continues His Harassment of Turley*

With these events escalating the racism in the Pickler, Area Manager
Jaworski continued his mistreatment of Turley, degrading him, calling him "boy,"
and doing nothing to stop the harassment. The stress from Jaworski's
mistreatment became so bad, Turley had to be transported from the Pickler by
ambulance to Buffalo General Hospital where he was admitted overnight and
again diagnosed with panic attacks and PTSD. (A380-82) Despite hearing reports
Jaworski addressed Turley by the racially offensive "boy," Marchand never
investigated. (A569)

### *Turley's Workstation Chair Is Destroyed*

In May 2006, Turley's workstation chair was intentionally smeared with a
thick layer of black grease, destroying the chair. (A319-20; A1306) Jaworski
conceded the grease was deliberately applied. (A497-98) Defendants laud the
shift manager's "investigation," but that consisted of the manager first accusing
Turley of applying the grease himself, then giving an implausible excuse that
millwrights accidentally transferred it from their clothes, and then merely asking
the Pickler crew as a group if they knew anything about the greased chair.
Waiting until several months later, Marchand briefly spoke to the men who
worked that day. (A178-79; A838-39; A864-67; A1160) Turley made another

criminal complaint to the Lackawanna Police, but Police Detective Cardi's investigation was frustrated by defendants' lack of cooperation. By now, Cardi had attempted to investigate several incidents at the plant, but was met with resistance from defendants, who refused to provide requested information. (A994-1000) As Detective Cardi explained:

> You can knock on the door so many times, if nobody answers, you stop knocking on the door. I asked for materials in the past, I was placated. I was promised things, and I didn't receive things.

(A463-64)

### Pelc Again Threatens to Kill Turley

That same month, Pelc again threatened Turley's life. Co-worker Daley relayed Pelc's threat to Turley: "I will kill his [Mr. Turley's] black, nigger ass if anything happens to me." (A1303) Turley reported the threat to plant security, but it did not investigate. (A1312)

### Turley is Forced to Work and Communicate with Pelc

After Turley informed management he was scared Pelc would harm or kill him, rather than protecting the victim from a known harasser, defendants continued to schedule Pelc to work with Turley. When Pelc was assigned to the closest workstation to Turley, he intentionally ran a 30,000 pound steel coil backwards so it dropped off the processor roll. Turley heard Pelc laughing, told

him over the radio he would have a problem with management, and immediately reported the incident as instructed. Turley never confronted Pelc, but defendants disciplined Turley, suspending him for two days. (A332-34; A849-50)

Defendants also forced Turley to communicate directly with Pelc. The Pickler's communication system could be heard by everyone along the production line and management. Although Turley could have communicated production information to any operator, he was told he must communicate directly with Pelc. When Turley raised concerns, Jaworski threatened "if you don't communicate with Mr. Pelc, I'm going to fire you." (A331-32)

### KKK

In July 2006, "KKK" was scrawled in large letters across the wall near Turley's workstation. He suffered another panic attack and was again transported to the hospital. (A327-31; A1310) After a few days, a shift manager "washed" off the KKK while laughing. He faintly spray-painted over it to allow the KKK to remain visible. (A1339) Witnesses confirmed the photograph of KKK depicted in Joint Exhibit 11-1 was taken **after** defendants "removed" it. The "erased" yet still clearly visible version remained for at least a month. (A254-55; A508; A512)

Sampsell, who was head of plant security, never bothered to look at the KKK and did nothing to respond to this threat against Turley. He denied KKK

was racist.  (A521-24)  Defendants claim Marchand talked to employees three times, but he merely asked five people in the area one question.  Several weeks later he talked to a few support people who "might" have been walking through the area, and more than a month later, he asked the Pickler crew one question.[6] Marchand scribbled minimal notes on scrap paper and did not even take photographs of the KKK.  (A580-82; A846-47; A1164-65)

### Defendants Fail to Respond to Turley's Alertline Complaints

AMUSA maintained a confidential employee hotline known as Alertline to assist employees with harassment complaints.  (A543)   In August 2006, Turley contacted Alertline, reporting he was the continuing target of death threats, racial graffiti and slurs.  No one responded to the complaint.  (A1311)  Although Turley called Alertline several times during events, he never received a response.  (A377-78)

### Sampsell Attempts to Get Turley Fired

Rather than direct his efforts at the harassers, Sampsell sought reasons to fire Turley, the victim.  Turley learned Sampsell hired a private investigator to run a background check on him, hoping to find a felony.  Sampsell admitted Turley

---

[6] Defendants cite Defense Exhibit 56 (A1171) as evidence of Marchand's investigation, but these notes relate to a second incident of KKK graffiti.

was the only employee subjected to a background check. (A422; A539-40) He did not explain how investigating the victim would stop the harassers targeting him with racial slurs, threats and graffiti. As Chief Judge Skretny noted, Sampsell's implausible excuse that "maybe there was something in his background that might help me determine if I could help him" was easily discredited by the jury. (A539)

In September 2006, Sampsell secretly installed surveillance cameras to spy on Turley. One camera was installed in his workstation, focused solely on Turley, and the other was focused on his station, with a wider view blocked by a steel beam. Workers from another department warned Turley that Sampsell was spying on him. When Turley asked about the cameras, Sampsell lied, claiming there were none. He removed the cameras after learning Turley knew about them. (A181-82; A336-40) Pickler co-workers harassed Turley over the surveillance. (A843) Sampsell's claim he was trying to catch Turley's tormenters was easily discredited, given the camera's placement and his failure to request audio surveillance to monitor the racial slurs and threats. (A601)

After the cameras were removed, eyeball graffiti appeared to warn Turley he was being watched. That graffiti remained for several weeks. Although Turley reported it to Marchand, Sampsell, and plant superintendent Carl Pfeiffer, they did

not investigate.  (A340-43; A1016)  Knowing defendants were attempting to find

pretext to fire him caused Turley even more stress.  (A342)

### *Turley's Vehicles Are Repeatedly Vandalized*

Beginning in 2005, four of Turley's vehicles were vandalized in the plant's

parking lot.  (A361-62)  Access to the plant was controlled by security fencing and

gates through which employees and visitors had to pass.  (A455)  Sampsell

repeatedly refused to investigate the vandalism, although vehicle damage and

security investigation were within his job responsibilities.  He investigated once,

but not on his own initiative.  Rather, Sampsell "decided that because he [Turley]

was so insistent, I would take a look at it."  (A753; A794-95)  Turley filed three

different police reports stating vehicles were damaged numerous times.  (A994;

A997; A999)  By October 2006, the plant's security refused to call the police

anymore because vandalism of Turley's vehicles had become an ongoing problem.

(A465)  Sampsell also blocked Detective Cardi's investigations into these crimes,

and would not provide the parking lot surveillance he requested.  (A455-56;

A461-63; A465-67)

### *Daley Confronts Turley*

Co-workers continued to openly harass Turley without fear of punishment.

While Turley was meeting with Marchand, Sampsell, and the union representative

in the Pickler, co-worker Daley charged Turley as if to assault him, screaming "shut up you fucking black cry baby bitch. Fuck you. You ain't shit. You're always crying like a bitch." (A312) Marchand and Sampsell stood there, taking no action to protect Turley. Daley was not disciplined. (A312-13)

### Cry Baby Graffiti

In December 2006, a cry baby face with tears was drawn on a wall in the direct sight line from Turley's workstation. (A309-11; A1340; A1341) One witness described it as a racist blackface figure. (A256-57) Turley cried regularly at work (A305; A325; A335; A395; A630-31; A660-61), and co-workers Pelc, Daley and Reiter harassed him with daily taunts of "black cry baby bitch." (A310) The graffiti remained for several weeks. (A256-57) Marchand spoke to Turley and a few others in the area and did nothing further. (A593) Sampsell laughed. (A312) Daley confessed at his deposition to drawing the cry baby graffiti, but defendants did not discipline him. (A711-12) They left him in the Pickler to work alongside Turley.

### Additional Death Threats

In February 2007, Turley informed the union vice president he feared for his life and safety. Two co-workers had confidentially warned Turley that Pelc wanted to kill him and Pelc and Reiter were plotting to physically harm him.

Turley reminded the union official of Pelc's previous death threats.  (A1303;

A1312)

Sampsell and Nevin Hope (Marchand's HR successor) investigated by

interviewing Turley and speaking briefly with Daley, who had relayed one of

Pelc's 2006 death threats to Turley.  Daley denied everything, including his own

racially offensive conduct toward Turley.  After thirty minutes, Sampsell and

Hope concluded their investigation of multiple death threats.  Most of that time

was spent talking to Turley.  (A1303-04)

The jury rejected defendants' attempt to fault Turley for his reluctance to

name the employees who confided in him for fear they would be subject to

reprisals.  This was not unreasonable given defendants' practice of questioning

witnesses on the Pickler floor.  Defendants made no effort to independently

identify the employees, monitor the Pickler office where Pelc and Reiter were

reportedly plotting, post security in the Pickler, or take other action to stop the

hostile environment.

### *The Second KKK Incident*

KKK was again written on the wall opposite Turley's workstation in

February 2007.  (A343-44)  Defendants conceded at trial it was different KKK

graffiti than the first incident.  Sampsell did nothing to investigate this hate-filled

graffiti, again laughing it off as horseplay.  (A345; A495-96; A525-26; A584-86)

Marchand's investigation notes reveal defendants' alarmingly lackluster response.  When Turley called security, he was told to fill out a report at the end of his shift.  The security officer hung up on him and did not respond to the racist incident.  After Turley contacted the union man, Marchand conjured a theory that the July 2006 KKK suddenly bled through the paint that day and concluded, "[i]n any event, the letters are not believed to be new."  (A1171)  Having reached that conclusion, his investigation could hardly be thorough.  Indeed, he only asked Pickler employees two questions.  (A1171)

Most telling is how Sampsell intercepted Lackawanna Police Detective Cardi when Turley called him in to investigate.  (A1172)  Sampsell escorted Cardi out of the Pickler and into a meeting room where Cardi's investigation ran into defendants' stone wall.  Detective Cardi testified:

> And again at that point I thought with everybody in the room I asked again if I could have copies of the materials for the file so that I could continue the investigation.  And once again I was told that they were going to check with their legal department and that's where it ended.  I never heard a word after that.

(A468)

### Another Co-Worker Confronts Turley

In a seemingly planned confrontation, co-worker Dave Pyanowski tried to bait Turley to hit him so Turley would be fired. (A228-29) He got menacingly close, shouting "black bitch," "fuck you black piece of shit," and "get your black ass out of here. Get the fuck out of here. We don't want you here anyway." He told Turley to "tell your fucking Jew bitch lawyer to suck my dick."[7] (A356-57)

The union man arrived to find Turley visibly upset, shaking and crying. He escorted Turley to Sampsell's office, and found Sampsell and Pyanowski laughing about the incident together. Pyanowski admitted he had "gone over the line" and the offense was serious enough to get him fired. He gave what the union man described as a "half-ass" apology. Sampsell did not discipline Pyanowski at all. (A183-84; A358-61; A541-43; A612)

### The Black Monkey Hung by a Noose

In December 2007, a stuffed black monkey was hung by a noose from Turley's car. He again had to leave work and seek medical attention. (A1010; A364-68; A421) While it evoked the terrifying threat of a lynching, HR Manager Hope downplayed it as an incident involving Turley's car. (A1173; A914)

---

[7] During the underlying events, the lead attorney handling Turley's action was Judith Biltekoff.

Incredibly, Sampsell focused on the fact Turley's parking permit was not registered to his current vehicle rather than the racist threat.  (A1329)

Hope conducted "confidential" interviews in Sampsell's presence, a defendant in this federal lawsuit now pending for a year.  He asked each employee the same seven questions.  (A1174-90)  Hope did not follow-up when several employees admitted they left their workstations during the relevant period.  Jaworski was also in the area, but was not questioned.  (A917)  Again, Turley called the police, but defendants refused to cooperate with Detective Cardi's investigation.  (A366-68; A453-54)

Defendants, through trial counsel, hired local attorney Joseph Saeli to investigate.  Eleven days after the event, Saeli spoke to Sampsell who gave a list of who to talk to.  (A701-05)  Saeli did not speak to employees until February 2008, more than two months after the monkey was hung by a noose from Turley's car.  (A695-96)  Sampsell allowed him to review parking lot footage only after he already determined the perpetrator was not visible.  (A777-78)  Defendants limited Saeli's role to this single event, causing him to treat it as an isolated incident.  (A706; A707; A708)  Neither prompt nor thorough, the investigation was not reasonable.

After the monkey was hung by a noose, defendants had the plant's electrical

department install lights in the parking lot.  (A778-79)  They did not explain why they waited more than two years after the racial harassment began.  No security escort was offered to Turley.  Although parking lot surveillance was inadequate to capture events surrounding Turley's car, defendants did not install additional cameras for more complete coverage.

### Pelc Destroys a Chair to Prevent Turley from Using It

When Turley was training at another workstation in June 2008, Pelc smashed the station's chair into pieces, shouting "That nigger ain't sitting in this chair."  (A376)  By the time Hope investigated, the chair was gone. No photographs were taken.  Hope spoke only to Pelc and accepted his incredible claim an accident broke the arm and caused the back to fall off.  (A886-87; A917-18; A1191-92)  Hope did not speak to the other workstation operator to test Pelc's claims.

### Monkey Sounds Are Broadcast Throughout the Pickler

Shrill monkey sounds were broadcast over the Pickler's communication system throughout work shifts for six months to a year, which defendants again passed off as horseplay. A worker eventually found a tennis ball with a monkey sound device in the Pickler's management office.  When he confronted the shift manager who was present with several employees, the manager laughed.  (A265-

66; A267; A270; A350-53; A1011)

The monkey sounds continued over the Pickler's communication system. Hope claimed to learn about the monkey broadcasts on July 2, 2008, but did not investigate until sometime after July 22. On one day only, he searched for the tennis ball and talked to employees on the Pickler floor. While several employees reported seeing a ball that made noise and the shift manager had been discovered playing with it, Hope focused on the ludicrous distinction that bird sounds, not monkey sounds were made, and ended his investigation. (A887-89; A919; A1193)

### *Death Threats Against Turley and His Attorney*

In September 2008, threats against Turley and his attorney were broadcast over the Pickler's communication system, menacing:

> Big E ... Ha, Ha, Mother Fucker. You're getting your P-Day, you black nigger bitch. You don't have to come to me, I'll come to you. I'll fuckin' shoot you. I'm going to kill you and that Jew bitch.

(A1264. *See also* A355) Once again, Turley became so upset he had to leave work. (A1103) Defendants investigated by spending 5 to 10 minutes with the Pickler employees, asking each the same 4 questions and then asking the same 3 questions of a few randomly selected employees. (A1258-63; A1264-75) Hope concluded his investigation by claiming he could not confirm racial slurs and

threats were made.  (A1278-79)  Sampsell, however, testified racial slurs and

threats were made over the Pickler's communication system against Turley and

another African American worker.  (A802-803)  That worker testified everyone

told management about the death threats.  (A436-37)

After three years of harassment, Sampsell began negotiations with the union

to record radio transmissions and install conspicuous video cameras in the Pickler.

(A1278-79)  For the first time, he offered a security escort and told Turley he

could leave his workstation to seek protection from a supervisor if he felt

threatened.  Increased walk throughs for a few weeks were promised.  (A1103)

Despite all the earlier harassment and threats, Sampsell sent his first and only

email to all supervisors, noting they should protect Turley.  (A803-05)

By October 7, Sampsell reached an agreement with the union to record radio

chatter and install video cameras.  (A791-93; A807-08)  With union agreement

obtained in less than a month since Sampsell's first effort, the jury properly

rejected defendants' excuse that union resistence stopped them from taking these

actions during the three previous years.  Defendants never installed the cameras,

however, before the plant shut down in March 2009.  They presented no evidence

they used the radio recording system.  (A349; A807-08)

### *Menacing Graffiti About Turley and His Family*

More graffiti stating "HEY U SUCK SO DOES YOUR ~~WIFE~~ DAUGHTER" appeared where Turley parked his car each day. It remained for some time before defendants removed it. (A369-70; A1342) When Hope investigated, he did not consider the fact Turley had a wife and daughter. While he talked to some employees, he did not review parking lot surveillance. (A920-22)

### *Racist Graffiti on a Railroad Car in the Pickler*

A drawing of an ape man appeared on a railroad car near the Pickler office. Employees and management laughed about it and the graffiti was not immediately removed. No photographs were taken. (A371-72; A922-24) Hope again asked pre-planned questions without follow-up to suspicious responses. He described the graffiti to Turley as: "a hairy-faced man that could have been perceived as an ape-man, a caricature of a monkey-man, [and] a picture of a black gentleman..." (A1302) Hope's willful blindness to the identity of the white employees making these offensive characterizations – Pelc, Daley and Edgar – and his callous reiteration to Turley allowed the jury to infer defendants had no genuine intent to stop the harassment.

## C.     Defendants' Alarmingly Inadequate Response

While defendants cite certain testimony and evidence in isolation to create

the appearance of a response, Chief Judge Skretny found ample evidence

defendants' response was "alarmingly inadequate."  (SPA49)  He held:

> [T]he jury was free to find that Defendants' own lackluster effort in
> stopping the behavior was the true reason it continued and escalated.
> There is sufficient evidence that management acquiesced in this
> abhorrent conduct by dismissing it as trivial, conducting
> investigations in name only, and administering mild, slap-on-the-
> wrist punishment instead of genuine discipline that would have sent a
> more forceful message.  Given the number of incidents, the duration
> over which they took place, and their severity, the jury was not
> unreasonable in concluding that Defendants were grossly negligent
> for failing to conduct more thorough investigations, or for failing to
> address Turley's complaints with greater earnestness and alacrity.

(SPA23)

Several witnesses recognized defendants' failure to respond.  The union

representative testified the company was not stopping anything.  (A196)  Other

employees confirmed management was aware of the hostile environment but did

nothing about it.  (A232; A435)  One testified "Even after you complained to

management, they didn't do anything."  (A268)   Another rightfully observed,

"whatever kind of company you are, there's - there's something where you just

stop everything and say no, this isn't going to carry on."  (A241)  The jury

unanimously agreed.

Supervisors Jaworski, Marchand, and Sampsell participated in, dismissed, or did not even recognize the racial harassment. As defendants in the pending action, their investigations could hardly be considered impartial. Unfortunately for Turley, the foxes were guarding the hen house.

The evidence showed no coordinated effort by management. Lackawanna's top managers, including Sampsell, Marchand, and Jaworski, never discussed the racial harassment of Turley at their daily meetings held to discuss problems in the plant. (A482-83; A499; A500-01) Marchand never prepared formal reports to circulate. (A862-63; A870) Sampsell waited three years to send one email to plant managers about the need to protect Turley. (A1104) Astoundingly, Marchand's HR successor Nevin Hope only learned about Turley's complaints when he stumbled across information on the internet. (A912-13)

Turley complained to all levels of management. Plant superintendent Richards said management would not let this dumb nigger tell us what to do. (A243) He told Turley "whatever you do, we got money to fix this." (A288) When Turley begged for help from Richard's successor, Carl Pfeiffer, he did nothing (A288), telling Turley, "I ain't going to let you jeopardize this business." (A236)

Defendants failed to administer meaningful punishment. Between January

2006 and the plant's closure in March 2009, only two employees were disciplined for the egregious harassment. Pelc received three days off, compensated by overtime, for the January 2006 King Kong Lives graffiti, and two days off for the February 2006 death threat against Turley. (A176-77; A306-07; A579; A801) In 2007, an employee received a five day suspension when he stated to a supervisor, "Do I have to work with that black man?" (A233-34 Defendants did not punish other known offenders. *(See, e.g.*, A312-18; A612; A711-12)

Despite the death threats and escalating harassment, defendants did not seek police help. In contrast, Turley contacted police more than ten times. (A367) Police Detective Cardi tried to investigate events, many of which constituted crimes, but Sampsell and AMUSA blocked his efforts. When Cardi requested information, Sampsell promised to check with the company's legal department and Cardi heard nothing further.[8] (A456; a461-67; A468; A476-75) He found defendants to be quite uncooperative. (A469)

Defendants failed to comply with Collective Bargaining Agreement (CBA) provisions aimed at combating civil rights violations. In September 2005, the union representative requested a Joint Committee on Civil Rights as required by

---

[8] There was no legal department at Lackawanna, only at AMUSA. (A857-58)

the CBA to address Turley's initial complaints, but Sampsell refused.  (A169-70)

He "absolutely" believed he could delay the Committee's formation as long as he

wanted.  (A527; A797-98)  Defendants did not convene the Committee until 2007

after continued union demands.  (A187; A648; A662-63)  Incredibly, it never

investigated Turley's civil rights complaints.  (A546-48)

The CBA also required periodic harassment training for all employees.

AMUSA did not provide that training until October 2007, two years after the

harassment had escalated.  (A1194; A173; A206-07; A545)

The jury reasonably rejected defendants' reliance on "reminders" to

employees about AMUSA's and Lackawanna's harassment policies.  Defendants'

words, without prompt, meaningful and progressive action to back them up, were

mere lip service, not calculated to stop the ongoing harassment of Turley.

Defendants' allegedly increased presence in the Pickler was contradicted by

the evidence.  Shift managers participated in the harassment, condoned it, or

refused to get involved.  (*See, e.g.,* A270; A373-74; A411-12)  Jaworski walked

through for production purposes before crews arrived and did not return until the

end of his day.  (A727-30)  Marchand admittedly did not walk through until "a

good chunk of time" after March 2006 and retired in March 2007, covering a

small period at issue.  (A840-41; A853-54) A defense witness denied seeing

Marchand in the Pickler very often. (A622) Sampsell's September 2008 letter, after threats to Turley and his lawyer, stated supervisors' presence would be increased for a few weeks, suggesting no extra presence before or after.[9] (A1103) A security guard was never posted in the Pickler. An undercover investigator sent into the Pickler in August 2007 was so inept under Sampsell's direction that he was discovered within two hours. Defendants never attempted another undercover investigation. (A772-75)

Chief Judge Skretny found ample evidence defendants' own lackluster efforts were to blame for the ongoing hostile environment rather than any alleged "code of silence" or "5-O" excuse that defendants rely on now. Evidence showed they knew who was causing problems in the Pickler. One employee confirmed management knew Pelc and Reiter were racists, but did nothing. (A443-44) An Alertline complaint identified Pelc, Reiter and Daley as violent, and reported Pelc's threat to kill another employee. (A1007) Pelc, Reiter and Daley's dislike of Turley was well known, and management was told Pelc was a problem. (A239-40; A247; A633-34; A664-65; A723-24) When Detective Cardi telephoned

---

[9] Defendants cite the union president's testimony that some employees complained about management's allegedly robust presence in the Pickler. This testimony was easily discredited by the jury, as the same employees claimed Turley was harassing himself. (A646)

workers at home, some provided information. (A471-72) In contrast, defendants publicly questioned workers on the Pickler floor, an environment full of bullies and intimidation.

Throughout the lengthy ordeal, Turley was left crying in front of the plant's managers and begging for help. (A288; A305; A325) For three and one-half years, he endured the abuse to provide for his family. (A326) Chief Judge Skretny observed:

> Indeed, there can be no serious dispute that Turley experienced prolonged, egregious conduct, and that he had significant emotional and physical repercussions from the harassment that he endured at the Pickler. This is not a case where a black employee was simply passed over for a promotion, terminated out of bias, or retaliated against for making a complaint. Nor is this a single incident of racial insensitivity or discrimination. Turley was instead made to suffer daily ignominies and outrageous abuses. Testimony revealed that Turley, once a proud and animated athlete, was rendered a mere shell of the man he once was.

(SPA36-37) Turley was diagnosed with PTSD and Adjustment Disorder with Depressed Mood, Anxiety and Panics, and continued to suffer from those disorders at the time of trial. There was also uncontradicted medical evidence he would have permanent effects throughout his life.[10]

---

[10] Turley's injuries will be more fully discussed at Part IV *infra* regarding compensatory damages.

# SUMMARY OF ARGUMENT

Chief District Court Judge William Skretny correctly denied Lackawanna and Sampsell's motion for judgment as a matter of law (JMOL) on Turley's IIED claim. Ample evidence supports the jury's finding of extreme and outrageous conduct. For three and one-half years, Turley suffered daily abuses and vulgar racial epithets punctuated by extreme incidents, including death threats, that would not be tolerated in any civilized society. He was humiliated every day. Evidence shows Lackawanna and Sampsell authorized the campaign of harassment to force Turley to quit and sought pretext to fire him, rather than discharge the harassers and threaten steel production. They knew of Turley's vulnerability and the severe effect on him, yet refused to provide protection. Even worse, when Turley sought help elsewhere, they blocked his efforts, leaving him at the mercy of his harassers. Sampsell even seemed to enjoy the abuse of Turley. Their conduct meets the extreme and outrageous element of IIED, and the jury's verdict was not the product of sheer surmise and conjecture.

Chief Judge Skretny also correctly denied AMUSA's motion for JMOL because ample evidence showed AMUSA and Lackawanna acted as a single employer. This included AMUSA's centralized control of labor through workplace policies governing employee conduct and discipline, its supervision and control of

harassment complaints at Lackawanna, AMUSA's participation in the response to the harassment of Turley, and its decision to close Lackawanna, thereby terminating all employees. There was also evidence of interrelated operations between AMUSA and Lackawanna, and common management and ownership. AMUSA presented no evidence to explain its allegedly separate status. The jury's verdict finding single employer should be affirmed.

Defendants failed to specifically raise their current objections to the jury charge and verdict form in the District Court and have not shown fundamental error affecting the entire integrity of the trial. The jury was expressly and correctly instructed to consider the totality of the employer's response and was not mislead into imposing liability based upon the inadequate response of one supervisor. Even if defendants had properly raised their objections and the charge was somehow ambiguous, they cannot show any prejudice under a *de novo* standard. The jury found all three of Turley's supervisors grossly negligent in failing to respond to the harassment and overwhelming evidence showed Lackawanna and AMUSA's response was alarmingly inadequate. Defendants cannot show any error, much less fundamental error.

The jury and Judge Skretny found Turley suffered egregious emotional distress. He endured prolonged daily abuse, and suffered a long list of symptoms.

He was diagnosed with PTSD and Adjustment Disorder with Depressed Mood,

Anxiety and Panic Attacks, and medical testimony confirmed continuing

diagnoses at trial.  More than three years after the plant closed, Turley continued

to suffer the same symptoms and could avoid them only if he isolated himself from

people.  The jury heard his testimony and observed his demeanor over several

weeks.  His wife and co-workers confirmed his suffering, testifying the extreme

racial harassment broke his spirit and permanently changed his personality.

Medical testimony confirmed he still suffers and will have permanent effects

throughout his lifetime.  Given the exceptional circumstances of this case, the

jury's compensatory award of $1,320,000 for egregious emotional distress does

not shock the conscience.

Both the jury and Chief Judge Skretny found AMUSA, Lackawanna, and

Sampsell's conduct extremely reprehensible.  This is not a case of isolated events,

but rather, daily harassment occurring for three and one-half years, including

while this action was pending.  Defendants paid lip service only to their obligation

to respond, failed to take meaningful and progressive action to stop the

harassment, and fostered the hostile environment.  Knowing Turley was suffering

and watching him beg for help, they recklessly disregarded his health and safety.

Turley was financially vulnerable, needing his job to support his family.  The

evidence also showed malice and deceit, as defendants had no earnest intent to stop the harassment. Defendants' perfunctory investigations, slap-on-the-wrist punishment, refusal to cooperate with police, and dismissal of extreme harassment should be strongly condemned. The remitted punitive damages ratio of 3.8:1 is necessary to punish this reprehensible conduct and deter future conduct. It is not grossly excessive and does not shock the conscience.

The Order and Judgment should be affirmed.

## STANDARDS OF REVIEW

Denial of a motion for JMOL is reviewed *de novo*. The Court views the evidence in the light most favorable to the nonmoving party, and does not weigh the evidence or the credibility of witnesses. JMOL can only be granted when there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Phillips v. Bowen,* 278 F.3d 103, 108 (2d Cir.2002).

When a party does not preserve his objection to a jury charge or verdict form, the Court reviews for fundamental error that is "so serious and flagrant that it goes to the very integrity of the trial." *SEC v. DiBella*, 587 F.3d 553, 569 (2d Cir. 2009). If an objection to a jury instruction is preserved at trial, the Court reviews *de novo*. It will reverse for a new trial "only if the appellant can show that

the error was prejudicial in light of the charge as a whole." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir. 1997). The format and language of a verdict form is reviewed for abuse of discretion and must be considered in conjunction with the jury instructions. *Lore v. City of Syracuse*, 670 F.3d 127, 159-60 (2d Cir. 2012).

A District Court's order denying remittitur of a jury's award for compensatory damages is reviewed for abuse of discretion, and considerable deference is accorded the factual findings of both Judge and jury. This Court will set aside a jury's award only if it "is so high as to shock the judicial conscience and constitute a denial of justice." *Zeno v. Pine Plains Cent. School Dist.*, 702 F.3d 655, 671 (2d Cir. 2012). The Court does not "vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages." *Lore*, 670 F.3d at 177. Instead, it focuses on whether the verdict lies within the range of awards in similar cases. *Zeno*, 702 F3d at 671. Under New York law, a compensatory award is reviewed to determine "if it deviates materially from what would be reasonable compensation." N.Y.C.P.L.R. §5501(c).

The Court reviews *de novo* whether a punitive damages award is so grossly excessive as to violate due process. *Payne v. Jones*, 711 F.3d 85, 98 (2d Cir. 2012). Under federal common law, the Court reviews a trial court's determination for abuse of discretion, and will reverse only when the award is "so high as to

shock the judicial conscience and constitute a denial of justice." *Id.* at 100;

*Hughes v. Patrolmen's Benev. Ass'n of City of New York, Inc.*, 850 F.2d 876, 883

(2d Cir. 1988). The Court views the evidence and draws all factual inferences in

favor of the appellee. *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683

(2d Cir. 1993).

## ARGUMENT

**POINT I      THE JUDGMENT FOR INTENTIONAL INFLICTION
                     OF EMOTIONAL DISTRESS SHOULD BE AFFIRMED**

The jury found both Lackawanna and Sampsell liable for IIED. There is

ample evidence of repeated and prolonged harassment, ratification of that

harassment, humiliation of Turley, physical threats, abuses of authority, and

knowledge of Turley's vulnerability, which when considered in the aggregate,

constitute extreme and outrageous conduct. The jury's verdict was not the product

of sheer surmise and conjecture.

The elements of an IIED claim are: (1) extreme and outrageous conduct;

(2) intent to cause, or reckless disregard of a substantial probability of causing,

severe emotional distress; (3) causal connection between the conduct and injury;

and (4) severe emotional distress. *Howell v. New York Post Co.*, 81 N.Y.2d 115,

121 (1993). Lackawanna and Sampsell challenge the judgment solely on the first

element, which requires conduct outrageous in character, extreme in degree, and considered intolerable in a civilized community. *Id*. at 122. It is designed to filter out "petty and trivial complaints." *Id.* at 121.

Under New York law, repeated or prolonged conduct meets the extreme and outrageous element. *Bonner v. Guccione*, 916 F. Supp. 271, 276-77 (S.D.N.Y. 1996); *Cavallaro v. Pozzi*, 28 A.D.3d 1075, 1078 (4th Dept. 2006); *Shannon v. MTA Metro-North Railroad*, 269 A.D.2d 218, 219 (1st Dept. 2000). Incidents or remarks not actionable when considered in isolation may become extreme and outrageous when considered in the aggregate. *Polley v. Federal Reserve Bank of New York*, 1994 WL 465923, *7 (S.D.N.Y. 1994); *Collins v. Willcox Inc.*, 158 Misc.2d 54, 57 (Sup. N.Y. Co. 1992).

The extreme and outrageous element is also met where there is "some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy." *Stuto v. Fleishman*, 164 F.3d 820, 828 (2d Cir. 1999). *See Gray v. Schenectady City School District*, 86 A.D.3d 771 (3d Dept. 2011)(vandalism, harassment, intimidation, threats and menacing phone calls); *Cavallaro*, 28 A.D.3d at 1078 (death threats); *Sullivan v. Board of Education*, 131 A.D.2d 836 (2d Dept. 1987)(defendant engaged in conduct to

force plaintiff to resign); *Kaminski v. United Parcel Service*, 120 A.D.2d 409 (1st Dept. 1986)(plaintiff threatened with criminal prosecution, verbally abused, forced to resign).

Extreme and outrageous conduct may be found where defendant abuses a position of actual or apparent power over plaintiff. *Vasarhelyi v. New School for Social Research*, 230 A.D.2d 658, 661 (1st Dept. 1996). Conversely, it may arise from defendant's knowledge of plaintiff's psychological vulnerability. *Elson v. Consolidated Edison Co. of New York, Inc.*, 226 A.D.2d 288, 289 (1st Dept. 1996); Restatement (Third) of Torts §46 (comment d)(2012).

Authorizing wrongdoing designed to force an employee's resignation is extreme and outrageous. *Sullivan*, 131 A.D.3d at 837. Harassment investigated by a supervisor who has prejudged a complaint is also outrageous. *Wulach v. Bear, Stearns & Co.*, 1988 WL 123632 *5 (S.D.N.Y. 1988). Similarly, promising but failing to address harassment, or being present during harassment but not intervening, are affirmative acts supporting an IIED claim. *LaBozzo v. Brooks Bros., Inc.*, 2002 WL 1275155, *2, *4 (Sup. N.Y. Co. 2002).

## A.    The Judgment Against Lackawanna Should Be Affirmed

New York holds an employer liable for its employees' intentional torts under the doctrine of *respondeat superior* if the challenged acts were committed

within the scope of employment. *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

Whether actions fall within the scope of employment is a question of fact for the

jury to decide. *Id.* Here, Chief Judge Skretny found sufficient evidence

supporting the verdict finding the challenged actions were taken in furtherance of

Lackawanna's business. (SPA25) Lackawanna and Sampsell do not challenge

that finding on appeal.

Instead, Lackawanna mistakenly argues only Sampsell's conduct can be

considered in holding it liable for IIED. (Appellants' Brief, p.21 fn.2) New York

cases, however, look to all employees' actions when considering an employer's

liability. *See, e.g., Carroll v. Bayeriche Landesbank*, 125 F. Supp.2d 58, 61-62

(S.D.N.Y. 2000); *Wulach,* 1988 WL 123632 *5; *LaBozzo*, 2002 WL 1275155 *4.

If each employee's acts are considered in isolation, an employer could avoid

liability for extreme and outrageous conduct by having different employees

commit each act. Judge Skretny recognized this when he found "management

preferred letting the harassment continue over taking workers off the line"

(SPA25) and by asking the jury to assess co-workers **and** supervisors' conduct in

determining corporate liability for IIED. (A1687-90)

The lengthy and extreme campaign of harassment against Turley meets the

extreme and outrageous element. Turley's workplace was filled with racial

40

epithets condemned by our society, his property was vandalized many times, he was subjected to physical confrontations, and was segregated by white employees. (A287, 307, 335, 356, 361-62)  Multiple death threats, KKK graffiti, and the black monkey hung by a noose invoked images of extreme violence against black men, causing Turley to fear for his life and safety.  (A308-09, 327-28, 343-44; A1312; A1264-75; A1303-04)  Such conduct is clearly intolerable in any civilized community.

In addition to Sampsell's conduct outlined below, Area Manager Jaworski constantly degraded Turley and called him "boy."  (A285-287)  A plant superintendent referred to him as nigger and another said he would not allow Turley to jeopardize the business.  (A243; A336)  Shift managers participated in the harassment or refused to address it.  (A265-66, 270; A373-74)  Management allowed racist graffiti to remain or "removed" it in a way that reinforced its existence.  (A1334; A1337; A1339; A256-57; A318, 342, 372)  Turley was forced to work and communicate directly with Pelc after Pelc's death threats.  (A331-34) Investigations were performed by managers who prejudged the harassment as acceptable horseplay.  (A301, 304-05, 321-22)  Perfunctory investigations conducted in name only, refusing to impose meaningful discipline, and observing incidents without intervening further signified ratification and authorization to

continue.  (*See, e.g.*, A176-77; A312-13, 318; A541-43)  Lackawanna's decision

to sacrifice Turley's civil rights to keep the Pickler's production line moving is

intolerable.

**B.    The Judgment Against Sampsell Should Be Affirmed**

Turley described "begging, begging ... [Sampsell] for help to stop this, stop

causing this pain on me every single day, and he didn't do nothing."  (A325)  He

often cried in front of Sampsell, who knew Turley was vulnerable, repeatedly

requiring medical attention due to the harassment.  (AT537-539; A765)  Sampsell

controlled security in the plant, blocked access by the police, and publicly

announced to the harassers he would not allow outside agencies to investigate

events in the Pickler.   (A324-25, 404; A456, 461-67, 468, 473-475)  He deceived

Turley by promising to protect him from Pelc, but then had Pelc work alongside

Turley.  (A334-35)  As head of security, Sampsell refused to provide protection to

Turley for three years despite multiple death threats.  (A1103  Abusing his

position of power, Sampsell created a situation that left Turley without any

protection.

Despite his responsibility to discipline employees, Sampsell refused to

administer meaningful punishment.  (A517-18)  He rewarded Pelc with overtime,

and allowed evidence of Pelc's harassment to "disappear" from his desk.  (A176-

77; 531)  Sampsell stood by while Daley confronted Turley, ratifying the harassment.  (A312-13)  He laughed with Pyanowski immediately following his abusive confrontation of Turley, described by witnesses as a set-up to get Turley fired.  (A183-84; A228-29)  The jury could have inferred Pyanowski acted at Sampsell's direction.

As Chief Judge Skretny observed, Sampsell viewed the victim as the problem.  He performed a criminal background check on Turley, hoping to find a felony, and installed video surveillance to get him fired.  (A181-82; A336-40; A422; A539-40)  Criminal investigations and video surveillance support an IIED claim when the employer's motive is outrageous.  *Sawicka v. Catena*, 79 A.D.3d 848 (2d Dept. 2010); *Vasarhelyi*, 230 A.D.2d at 661.

Sampsell affirmatively acted to allow the harassment to continue.  He refused to decide grievances or form the plant's Joint Committee on Civil Rights.  (A169-70; A180-82; A797-798)  He controlled Saeli's investigation and his directions to the private investigator caused immediate discovery.  (A701-05; A773-74; A777-78)  Most tellingly, Sampsell repeatedly thwarted police investigations.  (A458, 460-67, 468, 473-74)  There was even evidence Sampsell found pleasure in the harassment of Turley, laughing at racist statements, graffiti, and physical confrontations, and dismissing the continuous abuse as good old-

fashioned horseplay.  (A301, 312, 322, 325, 345)  The jury was able to assess

Sampsell's credibility and motives, and rightfully condemned his conduct as

extreme and outrageous.

Viewing the evidence and construing all inferences in the light most

favorable to Turley, the jury's unanimous verdict finding Lackawanna and

Sampsell liable for IIED was not the product of sheer surmise and conjecture.  The

judgment against them should be affirmed.

## POINT II   THE JUDGMENT OF SINGLE EMPLOYER
## SHOULD  BE AFFIRMED

Ample trial evidence demonstrates AMUSA and Lackawanna acted as a

single employer.  AMUSA presented no evidence to controvert its single employer

status.  Its motion for JMOL was properly denied.

## A.      AMUSA and Lackawanna Are a Single Employer

A four factor test is used to determine single employer status: (1)

interrelation of operations, (2) common management, (3) centralized control of

labor relations, and (4) common ownership. *Cook v. Arrowsmith Shelburne, Inc.*,

69 F.3d 1235, 1240 (2d Cir. 1995)(sufficient evidence to preclude summary

judgment).  A plaintiff is not required to show all factors, and there is not any one

factor the plaintiff must show, although courts focus on the centralized control of

labor. *Id.* at 1241; *Regan v. In the Heat of the Night, Inc.*, 1995 WL 413249 *3 (S.D.N.Y. 1995). "Employer" should be liberally construed to accomplish the remedial purposes of the civil rights laws. *Regan,* 1995 WL 413249 *3.

Case law demonstrates Turley presented sufficient evidence to hold AMUSA liable as a single employer. *See DeNardi v. DRA Imaging, P.C.*, 605 F. Supp.2d 550, 557-58 (S.D.N.Y. 2009) (common management, parent name on employment forms and documents, overlap in members of operating committee); *Almeida v. Athena Health Care Assoc., Inc.*, 2009 WL 490066 *5 (D. Conn. 2009)(common officers, parent provides benefits, use of parent letterhead, parent monitors complaints and approved of plaintiff's termination); *Cooper v. Braun Horticulture, Inc.*, 2002 WL 1063922 *2 (W.D.N.Y. 2002)(employees transferred between parent and subsidiary and some supervision by parent personnel); *Peltier v. Apple Health Care., Inc.*, 130 F. Supp.2d 285, 289 (D. Conn. 2000)(shared officers and directors, suggestion parent approved plaintiff's termination, employee handbooks from parent, employees transferred between facilities); *Westphal v. Catch Ball Products Corp.*, 953 F. Supp. 475, 479 (S.D.N.Y. 1997) (even if no centralized control of labor, other factors demonstrate single employer supporting jury verdict); *Regan*, 1995 WL 413249 *3 (employee, payroll and bank records maintained together, sharing employees, same President and shareholder).

45

Defendants' argument that the "parent **must** exercise day-to-day control over final employment decisions" (Appellants' Brief, at 30) is not supported by case law. This Court directs the test is flexible, and is satisfied where there is sufficient involvement in the employment process "even absent total control or ultimate authority over hiring decisions." *Cook*, 69 F.3d at 1241. *See also Niland v. Buffalo Laborers Welfare Fund*, 2007 WL 3047099 *7-8 (W.D.N.Y. 2007)(sufficient evidence despite no evidence of hiring, firing and disciplinary decisions made by related organization). Defendants' cases do not hold otherwise. They merely list evidence that is considered but not required.

### 1. **Centralized Control of Labor Relations**.

The CBA governing Lackawanna's employees was negotiated and entered by AMUSA or its predecessors. (A1343; A651-52) Its provisions were central to events, including prohibitions on harassment and requiring the Joint Committee on Civil Rights. (A1357-58) At trial defendants sought to excuse their grossly inadequate response by claiming they were constrained by the CBA's terms negotiated by the parent corporation. (A933)

Lackawanna's Equal Employment Opportunity policies were prepared and issued by its parent. (A1105, 1106-07, 1108; A859-60) Plant Rules and Regulations dated August 2006 and March 2007 and the Workplace Violence and

Harassment Policy dated March 2007 have the Mittal Steel name and parent logo, and apply to "Mittal Steel USA - Lackawanna," which is not identified as a separate corporate entity. (A116-19, 1120-23, 1125-26; A861) The defense relied heavily on defendants' distribution of AMUSA's policies, allowing the jury to infer AMUSA dictated employee conduct and disciplinary responses. (A934) The parent's workplace policies, when combined with other evidence similar to the evidence here, are sufficient to find single employer status. *Levine v. Reader's Digest Ass'n, Inc.*, 2007 WL 4241925 *9 (S.D.N.Y. 2007).

The defense also relied on harassment training provided to plant employees in October 2007 by AMUSA and the United Steelworkers Union. The written materials provided to employees identify "ArcelorMittal USA" on each page, along with its company logo. (A1194-1200) In contrast, Lackawanna's name does not appear in the document. Page two makes clear "the Company" is AMUSA, referring to the Labor Agreement it entered with the United Steelworkers. The document refers to the Company's employees throughout, and "forbids harassment at all levels of our operations." (A1221) It directs employees who are harassed or who witness harassment to report it to local personnel and to "the Corporate Human Resources Department, or the Corporate HR Complaint Line." (A1223-24) AMUSA expressly acknowledged "The Company is legally

responsible for conducting a prompt and thorough investigation" of harassment and may need to take remedial action. (A1225) After the local HR Department receives a complaint, it must "[r]eport the complaint to the Corporate Human Resources Department." (A1226) After investigating, the local HR Department must "[r]eview such [remedial or disciplinary] action with the Corporate Human Resources Department" and "[i]mplement approved action." *Id*. In an example provided to employees, AMUSA states local management can only take remedial action "after review and approval of the Corporate Human Resources Department." (A1245) Evidence of a parent's employee and harassment policies, combined with the parent's oversight of harassment complaints "powerfully suggests the existence of a single employer." *Saleh v. Pretty Girl, Inc.*, 2012 WL 4511372 *11-12 (E.D.N.Y. 2012) (stating JMOL finding single employer may be appropriate at trial).

AMUSA followed this procedure with Turley's complaints. When Turley raised Jaworski's differential treatment in 2005, he attempted to resolve his claims with a written settlement proposal. Marchand's notes state the "document would have to be reviewed by others ([plant superintendent] C. Richards & our corporate office)." (A1136) When defendants rejected the proposal, the harassment of Turley substantially escalated.

48

Lackawanna and its supervisors reported to and received other direction from AMUSA. When Detective Cardi asked for evidence, Sampsell stated he must consult the company's legal department at corporate headquarters in Chicago before he could provide the requested materials. (A1000; A465, 468; A857-58) Marchand and Hope also consulted with the legal department on employment matters. (A857; A911) Hope consulted with legal before sending Turley letters about underlying events. (A925) A parent's assistance in human resources functions, including advice about plaintiff's claim, has been held sufficient proof of participation in the employment process. *Magill v. Precision Systems Mfg., Inc.*, 2006 WL 468212 *6-7 (N.D.N.Y. 2006).

Hope's reports about the black monkey hung by a noose appear on AMUSA's letterhead, with its name and logo, and identify each employee by his AMUSA employee number. He read and gave copies of AMUSA's EEO policy to each employee, together with the CBA's civil rights provision negotiated by the parent. (A1174; A915-16) When Hope communicated with employees about events, it was usual and customary for AMUSA's name and logo to appear on letterhead, from which the jury could infer AMUSA and Lackawanna responded as a single entity. (A914) *See Toriola v. New York City Transit Authority*, 2005 WL 550973 *5 (S.D.N.Y. 2005).

Sampsell's September 2008 memorandum to management about hostile events in the Pickler was signed by Larry at "www.arcelor-mittal.com," the domain for AMUSA, suggesting an integrated response.  (A804, 806)

AMUSA controlled the Alertline employee complaint system.  Complaints went to AMUSA's corporate offices, where it prepared a report to send to the division where the wrongdoing occurred.  (A543-44; A592; A618; A868-69)  Turley called Alertline several times during events.  (A377)  Sampsell confirmed an Alertline memorandum about Pelc's February 2006 death threat was not prepared by Lackawanna.  (A799-800)  In September 2008, Hope told employees to call AMUSA's Alertline with information about the slurs and threats against Turley and his lawyer. (A905)

Several plant employees testified they were employed by AMUSA or one of its predecessors.  (A168; A221-22; A275; A434; A609; A616; A623-24)  The union president described plant ownership passing from Bethlehem Steel to ISG, to Mittal Steel to AMUSA in Chicago.  (A651)  He attended business meetings in Chicago. (A657-58)  Sampsell's business card listed Mittal Steel USA - Lackawanna as his employer, not designating Lackawanna as a separate entity.  The card displayed the parent's logo, and his email address was "larry.sampsell@mittalsteel.com." (A1022)

Employee time sheets identified AMUSA (with its stylized writing and corporate logo) or its predecessors, as the employer for the Lackawanna plant. (A604-06; A1012-15)  AMUSA used the same payroll system for all its plants and each employee had a five digit employee number assigned by AMUSA.  (A916)

Jaworski described "our division."  (A483)  Marchand and Hope were transferred between Lackawanna and the Burns Harbor, Indiana plant owned by AMUSA.  (A561-62; A872)

Mittal Steel USA, AMUSA's immediate predecessor entity, publicly represented itself as the same entity as Lackawanna.  Defense exhibit 51 includes Marchand's notes of the first KKK incident, recorded on a Mittal envelope listing its address as "Mittal Steel USA 3175 Lakeshore Road Blasdell, NY 14219-1409 USA."[11]  (A11652)

AMUSA provided benefits to employees at the Lackawanna plant.  It was the Plan administrator, sent correspondence to plant employees about the Plan, and decisions under the healthcare plan were appealed to AMUSA.  (1023-24; A651-57)

AMUSA's Annual Financial Information states it decided to close its Lackawanna facility in 2009, sold the facility's assets, and shifted production to

---

[11]  Blasdell is a village adjacent to Lackawanna.

AMUSA's other locations. (A1047)  This allowed the jury to infer AMUSA made the decision to terminate all employees, including Turley.  *Levine*, 2007 WL 4241925 *7 (parent's global corporate restructuring plan was catalyst for plaintiff's termination by subsidiary, demonstrating control of labor relations); *Williams v. Quebecor World Infiniti Graphics*, 456 F. Supp.2d 372, 386 (D. Conn. 2006) (parent's direction to subsidiary to eliminate a sales position sufficient evidence of centralized control of labor).

## 2. Interrelation of Operations, Common Management, and Common Ownership

The highest management position at the Lackawanna facility was plant superintendent, whose supervisor was not at the local facility.  (A481)  There was no CEO, CFO, or COO at the plant.  (A610-11, 617, 624-25; A651; A855-56; A910-11)  Mike Rippey could hire or fire the plant superintendent.  (A666)  He was President and CEO of both AMUSA and Lackawanna.  (A1639; A1655)

In SEC filings, AMUSA expressly refers to "ArcelorMittal USA's Lackawanna facility" as one of the plants it owns and does not distinguish it as a separate corporate entity.  (A1421; A1540)

AMUSA's Annual Financial Information describes itself as one of the largest steelmakers in North America with operations in 10 states.  Its operating

facilities are identified by location, not separate corporate entity. All financial information was reported in the aggregate. AMUSA described a centralized commercial leadership group directing its sales force. (A1036, 38, 40, 44-47)

Erie County Clerk's Office records show AMUSA owned land where the Lackawanna facility was located. (A1033) AMUSA holds the intellectual property rights for the processes used at Lackawanna. (A1418)

Approximately 80% of "ArcelorMittal USA's employees" are represented by unions, primarily the United Steelworkers. (A1417) The CBA at Lackawanna was between AMUSA and the United Steelworkers.

A Mittal Steel USA, Inc. SEC filing dated September 1, 2004, reports International Steel Group Inc. entered an amended credit and guaranty agreement. Listed borrowers included International Steel Group Inc. and ISG Lackawanna, LLC. The document was signed by Brian Kurtz as an officer of both International Steel Group, Inc. and ISG Lackawanna LLC, as well as numerous other ISG entities, including ISG Cleveland Inc. and ISG Burns Harbor LLC. (A1431; A1437-38)

According to SEC filings by ArcelorMittal Finance LLC, corporate formation and name change papers for the successive subsidiary entities were executed and filed by officers of those entities who did not work at Lackawanna,

including Gordon Spelich.  (A1427; A1428)

The Amended and Restated Limited Liability Company Agreement of ISG
Lackawanna LLC dated January 14, 2004, lists a board of managers and company
officers.  None were located at Lackawanna.  The Agreement is signed by Gordon
Spelich as Vice President of both ISG Acquisition Inc. and Lackawanna.  (A1451,
1454, 1457, 1461, 1466)

In a letter dated April 15, 2008, Mayer Brown wrote to ArcelorMittal
Financial Services, LLC, care of AMUSA, as counsel for AMUSA,  Lackawanna
and numerous other of AMUSA's plants. The letter reports AMUSA, Lackawanna,
and the other plants are guarantors of a loan.  Mayer Brown signs the letter as
counsel for all entities. (A1443, 1445, 1446)

SEC documents identify Lackawanna as a guarantor of AMUSA.  An
amended and restated limited liability company agreement for Lackawanna gives
AMUSA control over the decision to indemnify any person involved in litigation
at Lackawanna.  However, AMUSA required its counsel represent the person to be
indemnified.  AMUSA can also commence, defend or settle litigation pertaining to
Lackawanna.  (A1543, A1629-30)

Documents contained in the SEC filing show Michael Rippey as President
and CEO of both AMUSA and Lackawanna.  He executed documents on behalf of

both entities.  (A1639; A1655)  Other signatories are identified as officers or directors of both AMUSA and Lackawanna.  (A1639; A1655).  These officers sign for and perform the same roles for numerous other plants. (A1645-48)

Substantial evidence shows AMUSA's centralized control of labor relations, including with respect to Turley's hostile work environment claim.  Defendants' own documents show AMUSA required Lackawanna's supervisors to consult with and obtain its approval before responding to Turley's complaints.  The evidence also showed interrelation of operations, common management and common ownership.  At trial, AMUSA and Lackawanna introduced no evidence to explain their purportedly separate status or to contradict the evidence relied upon by Turley.   Viewing the evidence in the light most favorable to Turley, and making all inferences in his favor, the jury's unanimous verdict was not the product of sheer surmise and conjecture.

**B.**    **AMUSA Is Liable for the NYHRL Claim**

Liability is extended to a parent corporation under the New York Human Rights Law (NYHRL) where the parent had the power to hire and fire plaintiff, pay him, and control his conduct.  *Hargett v. Metro. Transit Auth.*, 552 F. Supp.2d 393, 405 (S.D.N.Y. 2008).  Some courts have applied the single employer doctrine to claims under the NYHRL.  *Saleh*, 2012 WL 4511372 *10.  Under either test, the

jury's verdict finding AMUSA liable under the NYHRL should be affirmed.

**POINT III  THERE WAS NO FUNDAMENTAL ERROR**
**IN THE JURY CHARGE AND VERDICT FORM**

Defendants failed to specifically raise their objections to the jury charge and

verdict form in the District Court, and must show "fundamental error" affecting

the entire integrity of the trial.  The charge, however, correctly instructed the jury

to consider the totality of the employer's actions in determining whether its

response to the harassment was reasonable.  There is no error, much less

fundamental error.

**A.     Defendants Failed to Preserve their Objections**

"[O]bjections to a charge must be sufficiently specific to bring into focus

the precise nature of the alleged error." *Palmer v. Hoffman*, 318 U.S. 109, 119

(1943).  A party may not object to an instruction on one ground at trial and argue a

different ground on appeal. *Meisel v. Grunberg*, 2013 WL 1197498 *1 (2d Cir.

2013) (summary order).

Defendants argue Charge 31 and Verdict Form question 2 somehow mislead

the jury into finding liability based on one supervisor's actions rather than the

employer as a whole.  Defendants never specifically raised this concern to the

District Court.  Instead, defendants' objection below focused on including

language that an employer's response may be found reasonable even if it fails to prevent further harassment. (A928-29) The court instructed the jury as defendants requested. (A938) Defendants did not raise their current objection.

Defendants also did not object to the parallel language in Verdict Form question 2. They endorsed the language now criticized, merely asking it be part of question 1. (A945-46 (stating the question "has [Turley] proven that a hostile work environment existed, because a supervisor with immediate or successive authority created or permitted it...is consistent with the jury charge on the elements for the existence of a hostile work environment"))

Having failed to specifically raise these objections with the District Court, defendants' challenge to the Charge and Verdict Form must be reviewed for "fundamental error." Defendants cannot meet their heavy burden.

## B. The Jury Charge and Verdict Form Were Proper

The District Court correctly charged the jury on the standard for imposing liability for co-worker harassment:

> When a hostile or abusive work environment is created and carried on by non-supervisory fellow workers of the plaintiff, the defendants and the plaintiff's employer will be responsible or liable for permitting such behavior only if the plaintiff proves by a preponderance of the evidence that the plaintiff's supervisor or successively higher authority knew, that is had actual knowledge[,] or should have known, that is it had constructive knowledge of the hostile or abusive

work environment and permitted it to continue by failing to take remedial action.

(A937-38)  This language accurately states the law and is similar to jury instructions approved by this Court.  *Perry*, 113 F.3d at 153.  *See also O'Rourke v. City of Providence*, 235 F.3d 713, 736 (1st Cir. 2001); 29 C.F.R. §1604.11(d).

The District Court then emphasized jurors were required to consider the totality of the employer's response before imposing liability:

> [A]n **employer's response** need only be reasonable under the circumstances....Whether an **employer's response** was reasonable has to be assessed from the **totality** of the circumstances.  Factors to be considered in determining whether the **employer's response** was reasonable include – okay, we're talking about **reasonable employer response** – the gravity of the harm being inflicted on the plaintiff, the nature of  the **employer's response** in light of the employer's resources, and the nature of the work environment.  An **employer's response** to coworker harassment is not unreasonable simply because it has not been successful in preventing further harassment.

(A938 (emphasis supplied))

Because Judge Skretny expressly instructed the jury to consider the "totality" of the "employer's response" before assigning liability, there is no merit to defendants' speculation that jurors were somehow mislead into imposing liability based on the inadequate response of one supervisor.  By focusing only on part of the charge, defendants violate the fundamental principle that jury instructions must be "read as a whole."  *Lore*, 670 F.3d at 156.  By reading the

entire charge, there is no doubt jurors were correctly instructed to consider the totality of the response by the employer. There was no fundamental error in the challenged instruction and verdict form.

## C.   Defendants Cannot Show Prejudice

Even if defendants properly raised their objection below, and the charge is reviewed *de novo*, they can show no prejudice. *Perry*, 115 F.3d at 153. As demonstrated in the statement of facts, the inadequacy of **all** supervisors' response was astounding. Chief Judge Skretny found sufficient evidence that management as a whole dismissed the horrendous conduct as trivial, conducted sham investigations, refused to impose genuine discipline, and failed to address Turley's complaints with earnestness or alacrity. (SPA239)

The jury unanimously imposed corporate liability under Title VII and §1981 for the collective inaction of Turley's supervisors. They unanimously found all three defendant supervisors individually liable for failing to respond to Turley's complaints of harassment. The jury rejected defendants' affirmative defense that the corporate defendants, as a whole, reasonably responded to the hostile work environment. (A1684) They also found Lackawanna liable under the NYHRL, for which they were instructed the employer is liable for harassment by

co-employees if "upper-level supervisors had knowledge of the conduct and ignored it."[12]  (A939)

Defendants have failed to show error, much less fundamental error in Charge 31 and the Verdict Form.  Because the jury clearly intended to impose liability upon AMUSA and Lackawanna for the collective inaction of all supervisors, defendants cannot even meet the burden under the lesser *de novo* standard, as they cannot show prejudice.

---

[12]  Jaworski was aware of events, but admittedly never spoke to Turley or other employees about any incident.  (A502-04)  Sampsell was responsible for enforcing plant rules, investigating harassment, and disciplining employees (A515-18; A519-20; A594; A796), but repeatedly denied conducting any investigation into the hostile environment or specific events.  (A522-23; A525; A549-50; A551-554)  Marchand conducted investigations in name only that were not designed to elicit information.  AMUSA and Lackawanna cite to a few actions by Nevin Hope, who started his human resources role more than one year after the harassment began.  (A874)  He never investigated the daily hostile conditions.  The few efforts cited by defendants were delayed and perfunctory.  (A1174 (identical questions with no follow-up regarding black monkey hung by noose); A886-87; A917-18; A1191-92 (accepts Pelc's incredible excuse about chair); A887-89; A919; A1193 (monkey sounds broadcast for months investigated only one day); A1258; A1264 (slurs and death threats investigated by minimal questions with no follow-up))  Defendants' reliance on shift managers is also misplaced, as they participated in the harassment, condoned it, or refused to get involved.  (*See, e.g.,* A270; A373-74; A411-12)

## POINT IV  GIVEN TURLEY'S EGREGIOUS EMOTIONAL DISTRESS THE COMPENSATORY DAMAGES AWARD DOES NOT SHOCK THE CONSCIENCE

Hearing the evidence and observing Turley throughout trial, both the jury and Chief Judge Skretny found he suffered egregious emotional distress with a permanent and debilitating effect due to the shocking and outrageous conduct defendants tolerated and fostered.  Those factual determinations should not be disturbed.  Given the exceptional circumstances of this case, the compensatory damages award of $1,320,000 does not shock the conscience.[13]

### A.  Turley Suffered and Continues to Suffer Egregious Emotional Distress

For three and one-half years, Turley endured continuous daily harassment, with vile slurs and ignominies aimed at him.  He was made to feel "less than a human" (A298-99; A351) and described the daily harassment as vicious and "like hell."  (A282; A285)  Racist events escalated the tension and conjured images of extreme violence against African American men. With confrontations and threats to kill that "fucking nigger," Turley worked in constant fear.  (A185-86; A245-46; A308-09; A335)

The physical and emotional toll on Turley was obvious.  He cried every day

---

[13]  Defendants speculate the jury must have thought the award was moderate (Appellants' Brief, at 38 n.9), but omit to tell this Court defense counsel suggested the jury's award should not exceed $250,000.  (A993)

at work and home.  (A309; A395)  He lost 36 pounds.  (A335; A388)  He suffered

panic attacks, high anxiety, fearfulness, rapid heartbeat, heavy breathing, chest

tightness, dizziness, finger numbness, constant sweating, shaking, loss of appetite,

nausea, inability to sleep, and nightmares.  He lost the desire for sexual intimacy

and withdrew from his wife.  He suffered depression and association withdrawal,

with isolation and loneliness, and lost the ability to trust people.  The symptoms

worsened as time went on.  (A209-11; A379-388; A428-32; A669-72; A676)  It

affected his everyday life, including his family life.  (A671)  This formerly

outgoing, sociable man was destroyed.  (A185-86; A245; A335; A346; A387-88;

A430-32; A430-32)  As a co-worker observed, defendants "broke his spirit."

(A248-49)

Turley was transported from work to the hospital on several occasions and

had to leave work multiple times due to physical and emotional distress.  (*See,

e.g.*, A380-83)  He treated with three doctors over several years and took multiple

medications for years.  (A388-93; A670; A674)  Lackawanna sent Turley to a

doctor who diagnosed him as totally disabled, but he returned to work to provide

for his family.  (A394)  His treating psychiatrist and psychologist testified Turley

was visibly distressed, and although medication helped a little, he continued to

suffer.  (A212; A214-15; A668-72)  Turley was diagnosed with Adjustment

Disorder with Depression, Mood and Anxiety/Panics, and PTSD. (A676-82) Past psychiatric history was negative. (A673-76; A691-92) Medical testimony causally related his injuries to the hostile environment. (A676-82)

Turley continued to suffer at the time of trial. The written trial transcript cannot convey the fact Turley cried throughout trial and constantly required a cloth to wipe away his profuse sweating as events in the Pickler were recounted. The jury was able to assess his sincerity and the extent to which he continues to suffer. As Chief Judge Skretny observed, the jury "witnessed a defeated and dispirited man in the courtroom. This apparently left a marked impression." (SPA36)

Turley testified he still cannot work around any people, does not socialize, cannot engage in activities with his children, has flashbacks, difficulty sleeping and continues to experience symptoms and triggers more than three years after the plant closed. (A394-96)

Dr. Syed Jaffri, Turley's treating psychiatrist, examined him on May 22, 2012 before testifying, and concluded Turley was not doing well. When he asked Turley how he felt, Jaffri observed just thinking about the environment "triggered the whole cascade of symptoms which he initially presented." (A684) Turley could only avoid the symptoms by isolating himself from other people. (A638-85;

A689-90)  Dr. Jaffri confirmed continuing diagnoses of PTSD and Adjustment

Disorder with Depressed Mood, Anxiety and Panics.  Turley would continue to

have triggers for the rest of his life.  (A685-86)

Defendants offered no expert testimony to the contrary.  Instead, they cite

isolated words from Jaffri's testimony but omit passages making clear Turley

continues to suffer debilitating and permanent injuries.  Defendants claim Jaffri

only testified "in some cases" people with PTSD have triggers throughout their

life.  Defendants omit the full context of Jaffri's testimony:

> Q.  And someone that suffers from Posttraumatic Stress Disorder, is it
> going to be common for them to have different triggers throughout
> their lifetime, whether it be in the media or other social interactions?
>
> A.  In some cases, yes.  It's like once burned always shy, the person
> becomes quite sensitive and fragile to situation just like we get
> veterans and any car starts, gunshot sound can trigger all those
> symptoms.  **Same has [sic] here if he's in an environment where
> there is a racial kind of tone or intimidating environment, he's
> likely to be more vulnerable.**

(A685-86 (emphasis supplied))

Similarly, defendants argue Turley is fully recovered because he did not

want medication and had his own coping mechanisms.  Dr. Jaffri, however,

testified Turley's method of "coping" was not successful.  In his opinion, Turley

had not improved, his symptoms were still significantly present, and he would

64

benefit from further medical treatment and medication.  Dr. Jaffri stated:

> [Turley's "coping" was not] a normal way of dealing with things, that he has isolated himself from people.  He confines to himself.  He's still constantly scared of people around as if he's going to run into the same situation....But I didn't think he was doing that well.  When I raised the question and asked him, his clinical picture was no different, nonstop sobbing, shaking, I couldn't continue it.

(A689-90)

Defendants also argue Turley's emotional distress must be measured by the number of medical appointments he had.  If compensatory damages were measured in this fashion, trial courts would not need juries, just charts.  Here, both the jury and Chief Judge Skretny had the opportunity to observe Turley, hear testimony from him, his wife, his co-workers, and two of his treating doctors.  They were able to assess credibility, Turley's sincerity, and the continuing way the hostile environment has devastated his life and health.  As one co-worker described, Turley was once a colorful, animated rooster who was a lot of fun to be around, but defendants "cut the head off the rooster."  (A248-49)

Viewing the evidence and construing all factual inferences in Turley's favor, the jury properly concluded he suffered and continues to suffer egregious and debilitating emotional distress, and will suffer that distress for the rest of his life.

**B.      Damages for Emotional Distress Do Not Require Discriminatory Firing**

Defendants rely on *Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012) to argue damages must be limited where there is no discriminatory discharge.  Lore proved unlawful retaliation, and was awarded $250,000 in damages.  This Court upheld the award, even though plaintiff's emotional distress began six months prior to the act for which defendant was held liable (a negative public statement about plaintiff).  In determining damages were within a reasonable range, the Court compared Lore's distress to qualitatively similar distress suffered by plaintiffs in another case where they also lost their jobs. It did not direct courts to lower or cap awards where there has been no discharge.  Defendants' reliance on *Abel v. Town Sports Intern., LLC*, 2012 WL 6720919 *17 (S.D.N.Y. 2012) is also unavailing, as the *Abel* plaintiff admittedly experienced garden variety, or the lowest category of emotional distress.

Assessment of damages is an exceedingly fact intensive inquiry that depends on the unique circumstances of each case.  *Scala v. Moore McCormack Lines*, 985 F.2d 680, 684 (2d Cir. 1993).  Defendants' argument that damages must be capped at $250,000 conflicts with that direction.  It defies logic to argue a plaintiff who experiences one or two harassing incidents and is discharged must always be deemed to have suffered greater emotional distress than a plaintiff who

suffers daily abuses and egregious conduct over a lengthy period of several years.

## C. Given Turley's Immense and Continuing Suffering, the Jury's Compensatory Damages Award Does Not Shock the Conscience

Defendants maintain Turley only suffered significant emotional distress, the middle of three categories of distress recognized by this Court, citing isolated phrases of the Order below. (Appellants' Brief, at 40-41) The jury and Chief Judge Skretny, however, found Turley's emotional distress to be the highest category of egregious:

> Defendants argue that the distress Turley suffered was neither significant nor egregious. This Court cannot agree; the jury recognized that Turley suffered immensely, and medical evidence, his own testimony, and that of his co-workers evidenced as much.

(SPA36) Defendants' citations to cases involving "garden-variety" or "significant" emotional distress should therefore be disregarded. The jury and Judge Skretny's factual findings are accorded substantial deference and should be affirmed.

Defendants fault Turley and the District Court for not citing a case awarding damages of the same magnitude. (Appellants' Brief, at 41) There are, however, no comparable cases involving such a prolonged period of "daily ignominies and outrageous abuses" rendering the plaintiff "a mere shell of the man he once was." (SPA37) Judge Skretny stated, "fully aware that verdicts of this sum for emotional

67

distress are exceptional, this Court finds the circumstances of this case to be equally exceptional." (SPA37) Defendants' deliberate indifference to and acquiescence in the extraordinary harassment and its devastating effect on Turley are the outliers. The amount of compensatory damages awarded simply correlates with those facts.

A review of other cases demonstrates the jury's compensatory award does not "shock the conscience." The egregiousness, frequency and duration of wrongdoing, the symptoms, effect and injuries of each plaintiff, continued suffering after events ended, permanency and the degree of debilitation are all factors to be considered. Past awards must be adjusted to present value. When considering that no case previously decided has involved each factor to the same degree present here, the jury's award does not shock the conscience. *See Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002) ($400,000; plaintiff shunned by co-workers, forced to wear bullet-proof vest in uncomfortable manner, not allowed to perform certain functions, and embarrassed on a few occasions; distress only evidenced by testimony of plaintiff and her boyfriend); *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38 (2d Cir. 1997) ($500,000; after a physical altercation with supervisor, plaintiff with extensive pre-existing psychiatric disabilities was discharged); *Osorio v. Source Enterprises, Inc.*, 2007 WL 683985

(S.D.N.Y. 2007) ($7,500,000 for emotional distress and harm to reputation; plaintiff depressed, anxious, embarrassed when she was fired after complaining of gender discrimination); *Chopra v. Gen. Elec. Co.*, 527 F. Supp. 2d 230, 243 (D. Conn. 2007)($500,000 for emotional distress; for one year, plaintiff received poor reviews, was subjected to menial tasks, received less responsibility than juniors, received retaliatory suspension and reduced benefits); *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 175 Misc. 2d 795, 807 (Sup. 1997) ($650,000; for two years plaintiff subjected to lewd language and sexual comments; plaintiff felt humiliated, intimidated and insignificant; psychologist who treated for 9 months testified plaintiff had improved but would be apprehensive throughout her life); *Town of Hempstead v. State Div. of Human Rights*, 233 A.D.2d 451 (2d Dept. 1996) ($500,000; for 9 months, plaintiff suffered pattern of lewd and offensive conduct; plaintiff received no medical treatment but was nervous, had difficulty going to work, and continued to be nervous). *See also Pollard v. E.I. Dupont De Nemours, Inc.*, 412 F.3d 657 (6th Cir. 2005) ($1,250,000; over 18 months plaintiff harassed by co-workers who isolated her, used derogatory language, made sexual comments, refused to follow plaintiff's direction; plaintiff suffered PTSD and depression); *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 513 (9th Cir. 2000) ($1,000,000 for emotional distress).

The District Court rightly looked to *Zeno v. Pine Plains Central School District*, 702 F.3d 655 (2d Cir. 2012) in holding Turley's compensatory award is not *de jure* excessive given the highly fact intensive nature of the determination. While there are differences in the cases, there are many similarities that justify Turley's award. As in *Zeno*, Turley endured three and one-half years of daily taunts of nigger and other slurs, degrading treatment, and bullying. (*See* Statement of Facts, pp. 3-7) Turley's daily environment was punctuated by death threats, physical confrontations, racist graffiti and images of extreme violence. (*See, e.g.*, A307; A308; A312-13; A327-31; A343-44; A355-57; A364-68; A1264; A1303) Defendants were deliberately indifferent to or worse, acquiesced in, the harassment. (*See, e.g.*, A176-77; A285-88; A3010; A304-*05; A312-13; A318; A321-22; A336; A541-43) They repeatedly failed to take proactive steps to protect Turley, and even less discipline was administered than in *Zeno*. (A176-77; A306-07; A579; A801) They never discussed Turley's harassment at plant meetings and blocked police efforts. (A456; A461-67; A468; A473-75; A482-83; A499; A500-01) Defendants were particularly aware of Turley's vulnerability, given his frequent crying at work, expressed fear for his safety, his begging for help, and the need to send him to the hospital on multiple occasions. (A288; A305; A325; A380-84; A537-39; A765; A1310)

In *Zeno*, plaintiff's evidence of emotional distress was presented through testimony from himself, his mother, and a representative of the N.A.A.C.P. He was frustrated, lonely, and suffered other emotional anguish. Turley presented evidence of his emotional distress through testimony from himself, his wife and co-workers. He received medical treatment at hospitals, his primary care physician, a psychologist and a psychiatrist. Both the psychologist and psychiatrist testified. Turley experienced a long list of symptoms and was diagnosed with PTSD and Adjustment Disorder with Depression, Anxiety and Panic Attacks. (A676-82) He continued to suffer from those disorders at trial. In *Zeno*, plaintiff's acceptance of an IED diploma was significant because it potentially affected his ability to attend college or enter the workforce. Here, Dr. Jaffri gave medical testimony that Turley's emotional distress continues to make him constantly scared to be around people, and he must isolate himself to prevent the debilitating array of symptoms. He confirmed Turley will have triggers throughout his life. (A685-86; A689-90) These debilitating symptoms substantially affect Turley's employability.

Given the exceptional circumstances of prolonged and egregious conduct, together with the severe, life-altering and permanent effect on Turley, the award of compensatory damages does not shock the conscience, and should be affirmed.

## V.    THE PUNITIVE DAMAGES ARE NOT GROSSLY EXCESSIVE AND DO NOT SHOCK THE CONSCIENCE

The jury was so appalled by defendants' reprehensible conduct, it unanimously imposed punitive damages totaling $24,005,000.  Chief Judge Skretny remitted punitive damages to $4,000,000 against AMUSA and Lackawanna for violation of Title VII and §1981 and $998,750 and $1,250 against Lackawanna and Sampsell, respectively, for IIED.  The remitted punitive damages ratio is approximately 3.8:1.  Given defendants' extreme reprehensibility and the need to punish and deter such conduct, the remitted punitive damages are not grossly excessive and do not shock the conscience.

### A.    The Punitive Damages Award Should Be Affirmed

Assessment of punitive damages is highly dependent upon the facts and circumstances of each case.  The Supreme Court set forth three guideposts: (1) the degree of reprehensibility of defendant's conduct; (2) the ratio of punitive damages to plaintiff's actual or potential harm; and (3) the disparity between the punitive damages and applicable civil penalties. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575-76 (1996).

### 1. The Defendants's Conduct Was Extremely Reprehensible

Reprehensibility is the most important factor in assessing punitive damages. *BMW*, 517 U.S. at 576. The more reprehensible the conduct, the greater the punishment should be. *Payne*, 696 F.3d at 201. Appellate review should ensure a punitive award accomplishes its purposes to punish what has occurred and deter its repetition. *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992).

Five factors are considered in assessing reprehensibility: (1) whether the harm caused was physical or economic, (2) whether defendant's conduct evidenced a reckless disregard of the health or safety of others, (3) plaintiff's financial vulnerability, (4) whether the conduct involved repeated acts or was an isolated incident, and (5) whether the harm was caused by malice, trickery, deceit or mere accident. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003). A defendant who repeatedly engages in prohibited conduct while knowing or suspecting it is unlawful requires "strong medicine" to cure his disrespect for the law. *BMW*, 517 U.S. at 576-77.

Chief District Judge Skretny found:

It is beyond dispute that the jury found Defendants' conduct to be particularly reprehensible. The evidence supports this conclusion. The overt racist harassment lasted for more than three years. It did not improve with time; it escalated. Investigations were feeble and perfunctory; responses were cursory. Defendants exhibited an

indifference to Turley's health, safety, and general well-being.  The
effect this had on Turley has already been detailed.  It is enough to
note here that it was deleterious and pervasive.

(SPA40)  Defendants seek to reargue the trial record, claiming their conduct was

not reprehensible.  They show no deference to the factual determinations of the

jury and Chief Judge Skretny.  The evidence demonstrates all five factors in the

reprehensibility analysis are present.

Turley endured racist and demeaning treatment every day, causing an

obvious deterioration of his physical and emotional health.  The harassment was

not a handful of isolated incidents.  Witnesses confirmed it happened

continuously.  (A186; A203; A205; A245; A629-32)  Defendants were fully aware

of the racist culture and events in the Pickler, including repeated death threats.  As

they watched Turley break down, even sending him to the hospital on multiple

occasions, defendants refused to take prompt, meaningful, and progressive action

to stop the harassment.  Worse, they participated in and condoned it, recklessly

disregarding Turley's health and safety.

In 2006, Turley was making more than $76,000 a year at the Lackawanna

plant.  (A1017)  He only had a high school diploma, and knew he could not obtain

another job that paid as well.  He was in a financially vulnerable position because

he needed to support his wife and three children.  (A272-74; A326)

The Lackawanna plant had a history of civil rights abuses. Describing a "sorry picture" of deeply entrenched racial mistreatment of African American workers, this Court stated, "[t]he fact is that the Lackawanna plant was a microcosm of classic job discrimination in the north, making clear why Congress enacted Title VII of the Civil Rights Act of 1964." *U.S. v. Bethlehem Steel Corp.*, 446 F.2d 652, 655 (2d Cir. 1971). Although the Court ordered relief, that decision did not end the mistreatment. *See Williamson v. Bethlehem Steel Corp.*, 488 F. Supp. 827 (W.D.N.Y. 1980); *U.S. v. Bethlehem Steel Corp.*, 1972 WL 207 (W.D.N.Y. 1972). Sampsell, Marchand, Jaworski and Hope all began their careers at the Lackawanna plant in the 1960s during this pervasive discriminatory culture. (A478-79; A514; A561; A872-73)

Punitive damages are also required to deter civil rights violations at AMUSA's other facilities, particularly given its centralized control over responses to harassment. In *Zajac v. Mittal Steel USA*, 2008 WL 4936975 *8-9 (N.D. Ind. 2008), the court addressed sexual harassment at AMUSA's Burns Harbor plant. In denying defendants' summary judgment motion, the court questioned the reasonableness of their response to severe and pervasive harassment. Notably,

after AMUSA closed the Lackawanna plant, it transferred Nevin Hope to Burns Harbor.[14] (A872-73)

Evidence also showed malice and deceit. The jury could infer defendants' perfunctory investigations were a charade designed as mere lip service to an employer's obligation to respond. Sampsell announced he would not allow outside agencies to investigate events in the Pickler, and he and AMUSA refused to cooperate with police, providing evidence defendants had no intent to stop the harassment. (A404; a456;A461-67; A468; A469; A473-75) Defendants deceived Turley, telling him they would respond, but took no meaningful action designed to stop the abuse. (A288; A293; A304-05; A321-22) They forced him to work side by side with his tormenters. (*See, e.g.*, A332-34; A849-50) Defendants gave excuses for the harassment that were proved false. (A178-79; A345; A495-96; A252-26; A584-86; A838-39; A864-67) They took actions to create a pretext for firing Turley. (A181-82; A336-40; A422; A539-40) They repeatedly laughed at racist incidents. (A301; A304-05; A321-22) These actions and responses, coupled with defendants' observation of a man pleading for help who was visibly

---

[14] In another case that had not yet reached the merits, the court ordered AMUSA to stop destroying evidence relevant to an employment discrimination claim. *Haraburda v. Arcelor Mittal USA, Inc.*, 2011 WL 2600756 (N.D. Ind. 2011).

deteriorating before them, supports a finding of malice and deceit.

Both the jury and Chief Judge Skretny properly concluded defendants'
conduct was extremely reprehensible, rightfully condemning it through the
original punitive award and the remitted award. Egregious reprehensibility
demands strong punitive medicine and the remitted award is neither grossly
excessive nor does it shock the conscience.

### 2.    The Remitted Ratio of 3.8:1 Is Not Grossly Excessive

Punitive damages must be judged on the facts and circumstances of
defendant's conduct and the harm to plaintiff. *State Farm*, 538 U.S. at 425. They
should be rational in light of their purpose to punish and deter. *Pacific Mutual
Life Ins. v. Haslip*, 499 U.S. 1, 21 (1991); *Greenbaum v. Handelsbanken*, 67
F.Supp.2d 228, 272 (S.D.N.Y. 1999) (higher ratio necessary to punish wealthy
defendant). Wealth of the wrongdoer should be considered when assessing a
punitive award. "Since a fixed dollar award will punish a poor person more than a
wealthy one, one can understand the relevance of [the defendant's financial
position] to the State's interest in retribution...." *BMW,* 517 U.S. at 591 (Breyer, J.,
concurring). An award must be sufficient to "smart" the offender. *Brink's Inc. v.
City of New York*, 546 F. Supp. 403, 413 (S.D.N.Y. 1982).

Punitive damages in a single digit ratio generally satisfy due process

concerns. *State Farm*, 538 U.S. at 425. In *Pacific Mut.,* 499 U.S. at 23-24, the Supreme Court concluded a ratio of 4:1 does not "cross the line into the area of constitutional impropriety." Two years later, the Court suggested the upper constitutional limit was closer to 10:1.[15] *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462 (1993). At a 3.8:1 ratio, the remitted punitive award is not grossly excessive.

Chief Judge Skretny did not abuse his discretion in imposing a 3.8:1 ratio. Considering the exceptional facts and circumstances of this case, the ratio is required to punish and deter. *See Chopra v. Gen. Elec. Co.*, 527 F. Supp. 2d 230, 244 (D. Conn. 2007) ($5,000,000 punitives roughly 5:1 ratio to emotional distress and back pay); *Kauffman v. Maxim Healthcare Services, Inc.,* 509 F.Supp.2d 210 (E.D.N.Y. 2007) (4:1 ratio); *Hill v. Airborne Freight Corp.,* 212 F.Supp.2d 59 (E.D.N.Y. 2002) (cumulative ratio of 5:1); *Greenbaum*, 67 F.Supp.2d at 272 (4:1 ratio); *McIntyre v. Manhattan Ford, Lincoln-Mercury*, 175 Misc.2d 795 (Sup.

---

[15] Defendants' reliance on *Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8th Cir. 2004) is misplaced. The *ConAgra* court remitted the punitive award to $600,000 because the lower court improperly relied on reprehensible conduct directed at other employees. There was no evidence plaintiff was aware of that conduct. *Id*. at 799. A single racial slur was directed at plaintiff and he experienced non-racial profanity and abuse at a higher level than white employees. *Id*. at 795. In contrast, the egregious racial harassment here was all directed at Turley.

N.Y. Co. 1997) ($650,000 for emotional distress and $3,000,000 for punitives).

Other Circuits have affirmed high ratios and punitive awards in civil rights cases, particularly where the defendant's conduct is reprehensible. *See Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005)($29,000,000 punitive award merited due to reprehensibility even with $27,500,000 compensatory award); *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003)(affirming 7:1 ratio with $2,600,000 punitive and $360,000 for emotional distress); *Bogle v. Mclure*, 332 F.3d 1347 (11th Cir. 2003)(4:1 ratio with $2,000,000 punitive and $500,000 compensatory to each of 7 plaintiffs); *Swinton v. Potomac*, 270 F.3d 794 (9th Cir. 2001)(28:1 ratio with $1,000,000 punitive and $35,600 compensatory).

The cases cited by defendants found a far lower level of reprehensibility than is present here. They address a limited number of hostile acts, conduct that was not extremely reprehensible, or little evidence of defendants' disregard for the health and safety of another. Defendants cite *Greenbaum v. Handelsbanken*, 67 F. Supp.2d 228 (S.D.N.Y. 1999) in an attempt to limit the punitive damages award. The *Greenbaum* plaintiff had been passed over for promotion several times over a six year period. In approving the jury's award of $1,250,000, the court noted defendant's conduct "was never violent, and each instance of discrimination and retaliation found was certainly less reprehensible than the worst imaginable

violations." *Id*. at 269. In contrast, Turley was subjected to death threats, physical confrontations, hate-filled and demeaning slurs, and violent images of racism that the jury and Judge Skretny found extremely reprehensible. (A307; A308; A312-13; A327-31; A343-44; A355-57; A364-68; A1264; A1303)

Defendants also rely on *Watson v. E.S. Sutton, Inc*., 225 F. App'x 3 (2d Cir. 2006). The plaintiff was subjected to one sexually inappropriate comment directed at her, ostracism by her fellow employees for one month, and discharge. *Watson v. E.S. Sutton, Inc*., 2005 WL 2170659 *5-6 (S.D.N.Y. 2005). This conduct over one month justified the punitive award of $717,000. In contrast, Turley was harassed every day for three and one-half years, and defendants' alarmingly inadequate response showed malice, deceit and a reckless disregard for his health and safety. The extreme reprehensibility present in Turley's case requires a higher punitive award.

Evidence supports a determination that defendants willfully placed the value of making money above Turley's civil rights and his physical and emotional health, which should be strongly condemned. (A288; A336) Given the enormous wealth of AMUSA, the remitted ratio is necessary to have any punitive or deterrent effect. AMUSA's interest income alone in 2009 was $81 million, its net worth in 2010 was $1.1 billion, and its total member equity as of December 31,

2008 was $1.3 billion.  (A964; A969-70; A973)  The punitive award must be large

enough to punish and deter and if remitted further, would not accomplish those

goals.

AMUSA is a large employer with facilities throughout the country.  Its

discrimination and harassment practices impact thousands of workers.  It must be

deterred from ever treating another worker the way Turley was treated.  The

remitted punitive ratio of 3.8:1 imposed by Chief Judge Skretny, who after

presiding over the trial deemed a punitive award that is the maximum permitted by

law to be appropriate, should be affirmed.

### 3.    Sanctions for Comparable Misconduct

The third guidepost is the least important factor to consider in reviewing

punitive awards. *BMW*, 517 U.S. at 583.  There is no statutory cap on punitive

damages for claims asserted under §1981.  *Pollard v. E.I. du Pont de Nemours &*

*Co.*, 532 U.S. 843, 851 (2001).  Title VII's ceiling on such damages does not limit

the relief available under §1981.  *Hawkins v. Legal Service Care*, 163 F.3d 684

(2d Cir. 1998); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1316-17 (2d Cir. 1995).  The

discrepancies between §1981 and the cap in §1981a indicates Congress intended

larger punitive awards under §1981.  *Chopra*, 527 F.Supp.2d at 246.  Here, a limit

of $300,000 would be insignificant to a large company like AMUSA and the more

important guideposts weigh strongly in favor of a high punitive damages award.

### 4. The Punitive Award Will Not Have "Stratospheric" Effects

Defendants attempt to frighten this Court by arguing affirmance will somehow send punitive awards in employment discrimination cases into the stratosphere. (Appellants' Brief, at 47) As Chief Judge Skretny held, this is a truly extraordinary case. No decision cited by the parties approaches the facts and circumstances here. Defendants should not escape meaningful punishment because no defendant in a prior case has acted as reprehensibly and caused as much damage. The application of this case to future awards will be limited by the severity of defendants' conduct and its effect.

Here, the egregious conduct, "the likes of which this country had hoped to leave in its past" (SPA49), occurred continuously for three and one-half years. It had a severe, debilitating and permanent impact on Turley's health. Defendants' response was so inadequate the jury rightly could have inferred malice and deceit. There was a history of civil rights violations at this plant. The plant superintendent's statement that "whatever you do, we got money to fix this" showed no intent to protect Turley's civil rights. (A288) Most events occurred while this action was pending, but shockingly, the prospect of liability under federal and state civil rights laws had no deterrent effect. Defendants who

disrespect the law require strong medicine.  Given the extreme circumstances of this case, the punitive award is not grossly excessive and does not shock the conscience.

## B.     The Punitive Award Against Lackawanna Should Be Affirmed

The punitive award against Lackawanna should not be disturbed due to its financial condition.  Defendants argue Lackawanna is a defunct company. Therefore, the punitive award cannot possibly cause Lackawanna's financial ruin. As of April 2012, its net worth was $1,132,000. (A956)  It also received $3,500,000 from the sale of its property in December 2010.  (A958-59; A981)  To the extent Lackawanna does not have additional assets, it is because AMUSA decided to close the Lackawanna plant and sold off its assets.  Disturbingly, this occurred while Turley's federal court action was pending, raising issues of fraudulent conveyance.  Moreover, as defendants' SEC documents demonstrate, litigation against Lackawanna is controlled by AMUSA when it is also a defendant. It appears the award against Lackawanna will be satisfied pursuant to its agreement with AMUSA.  (A1543; A1629-30)

Given defendants' extremely reprehensible conduct and the need to punish and deter such conduct, the remitted punitive damages award is not grossly excessive and does not shock the conscience.  It should be affirmed.

## CONCLUSION

It is respectfully submitted that the Court should affirm the Order and Judgment below in their entirety.

Dated:      Buffalo, New York
            October 24, 2013

/s/ Ryan J. Mills
Ryan J. Mills, Esq.
Mary C. Fitzgerald, Esq.
SCHNITTER CICCARELLI MILLS PLLC
*Attorneys for Plaintiff-Appellee Turley*
8770 Transit Road, Suite 3
East Amherst, New York 14051
(716) 639-7690

Richard T. Sullivan, Esq.
HARRIS BEACH PLLC
*Attorneys for Plaintiff-Appellee Turley*
Larkin @ Exchange
726 Exchange Street, Suite 1000
Buffalo, NY 14210
(716) 200-5050

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 17,382 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Corel WordPerfect X5 in Times New Roman 14 point font.

Dated:  October 24, 2013